263 P.2d 807

**HANSEN et ux.  v.  OAKLEY.**

No. 5622.

Supreme Court of Arizona.

Nov. 30, 1953.

As Corrected on Denial of Rehearing

Dec. 22, 1953.

308

Rhodes & McMillen, Mesa, for appellants.

Harold R. Scoville and Chas. A. Stanecker, Phoenix, for appellee.

UDALL, Justice.

Ruth Oakley as plaintiff brought suit against defendants Ray J. Hansen and Marie N. Hansen, husband and wife, and Dan Hansen, a single man, to recover damages for injuries she admittedly suffered as a result of the negligence of Dan Hansen in failing to heed a stop sign at the intersection of 48th Street and East McDowell Road, near Phoenix. The collision practically demolished plaintiff's car, and caused painful and permanent injuries to her person. The jury awarded her damages in the sum of $10,000 against all three defendants. Defendant Dan Hansen perfected no appeal from the judgment entered on the verdict, so it has become final as to him.

Ray J. Hansen and Marie N. Hansen will hereinafter be called by their first names, or designated as appellants. Judgment was entered against them upon the theory of respondeat superior and they appeal primarily upon the grounds that the trial court erred in denying (a) their motion for an instructed verdict made at the close of plaintiff's case, and (b) a similar motion renewed at the close of all the evidence; (c) their motion to set aside the verdict, and (d) their motion for judgment notwithstanding the verdict, or in the alternative for a new trial. The bases for these respective motions were, (1) that the evidence failed to show that Dan Hansen was in the employ of, and acting for and on behalf of, these appellants at the time of the occurrence of the accident out of which this suit arose, but that to the contrary the evidence definitely established that defendant Dan Hansen was engaged in a pursuit solely for his own personal benefit; (2)

that all the evidence adduced at the trial was so clear that reasonable men could not believe that at the time of the accident the relationship of master and servant existed between Dan Hansen and these appellants, so as to make the latter liable for the tortious acts of the former. We believe this case can be disposed of upon these assignments without considering the other grounds relied upon for reversal.

In determining this appeal we must, of course, construe the evidence in the light most favorable to sustaining the judgment, and if the evidence is of such a character that reasonable minds could differ as to the inferences to be drawn from the facts, the case was properly submitted to the jury. Ong v. Pacific Finance Corp. of California, 70 Ariz. 426, 432, 222 P.2d 801. On the other hand, if the evidence is not in conflict the only issue is whether the trial court properly applied the law to the facts. The rule is well settled that we are not bound by the conclusions of the trial court or jury, but are at liberty to draw our own legal conclusions from the admitted facts. See Sanders v. Brown, 73 Ariz. 116, 238 P. 2d 941, and cases therein cited.

We have carefully examined the evidence as to whether Dan Hansen was acting as the servant of appellants, and acting in the course and scope of such employment at the time of the accident. There is no material conflict in the evidence on this point. In fact, we need only consider the entire testimony of Dan and Ray Hansen, for the other thirteen witnesses threw no light on this crucial issue.

Ray operated a dairy and certain farms near Gilbert, Arizona. His brother Dan had been employed not at a weekly wage, but at hourly wages, for general work on the farm, other than dairy work. Dan boarded with appellants but was not expected to work, and did not work, on Sundays. On the morning of Sunday, March 19, 1950, just before Ray and his wife left for church, Dan informed his brother that he, Dan, was going to the horse races at Ingleside Track (now Arizona Downs), located just off Thomas Road, west of Scottsdale, Arizona, Ray then

"* * * mentioned as long as I was around that vicinity if I'd mind driving on over and picking up Buddy (a horse) if I felt like it."

Counsel for plaintiff in interrogating Ray on cross-examination drew from him this version of the conversation:

Mr. Scoville: "* * * on that morning you said, 'Dan, if you are going over to the races and happen to have time and want to, you might stop by and pick Buddy up and bring him home?' A. That is right."

Ray further testified without contradiction that at no time did he tell Dan "in specific terms to get Buddy".

"Buddy Jr." was a 19-month-old quarter horse owned by Ray that was then being trained for exhibition purposes at a stable

located behind the Silver Spur nightclub, on Seventh Street just south of Camelback Road, in Phoenix. Dan had been to the stable a week prior to the accident and knew how to get there from the race track. Ray had been going over to see the colt two or three times a week, and thought Buddy Jr. was not doing well at the stable, and Ray testified " * * * I had planned to come to the sale on Monday (the next day) and I would pick Buddy up at the same time."

Dan testified that on the morning in question he had intended to drive his own automobile to the races, as his brother Ray had asked him to do. Dan's car had a trailer hitch and would have been suitable, but it failed to start because the battery was run down, whereupon he "decided to take the pickup." While the evidence on the point is not definite, it would appear that probably the horse trailer was already attached to the Studebaker pickup. The truck and trailer, both of which were involved in the accident later that day, were owned by Ray. The latter testified that he did not at any time tell Dan to take his pickup nor did he authorize him to do so. To the contrary, Ray testified that some two months previously, owing to an accident in which Dan was involved, he had "asked him not to use the pickup any more", and except in connection with their operations on the farm, that until this Sunday Dan had respected his wishes.

After leaving appellants' dairy farm with the truck and its attached trailer, Dan drove north to the main highway, then east to see a friend near Apache Junction, which is in the opposite direction from the Ingleside Race Track. On the way Dan purchased a pint of whiskey from which he drank. About noon he arrived at the race track, where he stayed until about 4:00 p. m., leaving after the sixth race. While at the track he had been drinking with friends. Dan testified that before leaving the race track he had decided not to go over and pick up his brother's horse, Buddy Jr. Earlier in his examination he had inexplicably denied that originally his purpose in pulling the trailer that day had been to go pick up the horse.

Upon leaving Ingleside, he turned west on Thomas Road—though he might have returned home more directly by going east on the river road through Mesa. He then turned south on 48th Street, which was the first through road turning left, and followed this road a mile to its intersection with McDowell Road, where the collision with plaintiff's car occurred. Though Dan denied he was intoxicated, inebriation undoubtedly played a part in this unfortunate event, for even he admitted he felt the effect of the alcohol to "a certain degree". He left the scene of the accident without disclosing his identity, was apprehended near Mesa, and later plead guilty to a charge involving this conduct and was sentenced to jail.

While Dan admitted he did not know the name of the street he turned south on, and

was not too familiar with that area, still he testified that he was not lost, and was not attempting to find the stables. His uncontradicted testimony was that he was headed home, but first intended to go to the 2600 block on East McDowell to see a man named Ed Crawford who reputedly owned a horse Dan was interested in buying, and that he did not recognize McDowell Road when he came to it, so as to make a right hand turn there. In response to the question whether he knew on March 19, 1950, the most direct route he could have taken were he going to the stable to pick up the horse, he answered:

"Straight west on Thomas Road from the race track would have taken me directly to 7th Street, and a short distance north off of 7th Street I would have been right at the Silver Spur."

Upon cross-examination he was unable to orient the Silver Spur with Camelback Road, but said he could readily drive there.

We have examined the following Arizona cases, cited by counsel, dealing with comparable situations, viz.:

In Johnston v. Hare, 30 Ariz. 253, 246 P. 546, the owner of a car delegated his cousin to take it to a nearby garage. Instead, the cousin drove on a private errand for his own pleasure, and during the trip caused an accident. At the close of the evidence the trial court instructed a verdict for the owner, for the reason that the driver's agency ceased when the driver ceased to act within the limits of his agency. This court affirmed.

In Otero v. Soto, 34 Ariz. 87, 267 P. 947, an employee not required or expected to work Sundays, took his employer's truck without permission, for a Sunday pleasure trip. The employee injured third parties who sued both employer and employee. It was held error not to direct a verdict for the employer because all the evidence showed the driver was not acting for the employer or using the truck in the employer's business.

In Peters v. Pima Mercantile Co., 42 Ariz. 454, 27 P.2d 143, the employee instructed to drive the company truck on company business departed from his route to take a friend's sick dog to an animal hospital some two miles distant, and while returning to his route caused an accident. We affirmed the action of the trial court in directing a verdict for the employer, for the reason that the employee at the time of the accident was not prosecuting the work he was engaged to perform, nor acting to further the employer's purposes.

In Silva v. Traver, 63 Ariz. 364, 162 P.2d 615, the employee was driving the employer's car with permission on personal business, after working hours when he caused an accident. We affirmed the action of the trial court in directing a verdict for the employer, pointing out that the presumption that one who drives an automobile belonging to another is the agent of the other acting in the course and scope of his employment, is created only for reasons of procedural convenience, and vanishes in the

light of evidence which would allow a reasonable mind to infer that the relation of master and servant does not exist.

In McCauley v. Steward, 63 Ariz. 524, 164 P.2d 465, the employee was authorized to drive his employer's automobile but he drove it on an unauthorized side trip to see his girl friend which was a private venture of his own in no way connected with the master's purpose. The employee caused an accident while returning from this trip. Judgment n. o. v. entered for the employer, and we affirmed because the accident occurred during an unauthorized trip, as distinguished from a mere detour, pointing out that the master is not liable after the servant has abandoned the master's business.

■ From these cases the law is well established in this jurisdiction that certain facts must appear before the master can be held liable on the theory of respondeat superior for the negligent tort of his servant occurring in the operation of a motor vehicle. The relationship of master and servant must exist (see the excellent opinion by Justice Ross in Lee Moor Contracting Co. v. Blanton, 49 Ariz. 130, 65 P.2d 35, discussing this principle. Compare, Stockwell v. Morris, 46 Wyo. 1, 22 P.2d 189) and the tortious act of the servant must have occurred during the course and scope of his employment.

If the relationship be established, still the tort-feasor must be "acting on the master's business", "prosecuting the work he is engaged to perform", "acting to further the master's purposes", or in some way acting for and on behalf of the interests of the master with respect to the very transaction out of which the injury arose. If the servant has abandoned the interests, purposes, and business of the master and gone on a frolic for his own pleasure, liability of the master cannot be predicated on the theory of respondeat superior. Compare the more detailed analysis in 57 C.J.S., Master and Servant, §§ 555, 562, and 570.

■ Applying these legal principles to the facts of the instant case, clearly on the Sunday in question Dan's original mission was twofold: (1) to go to the races for his own pleasure, and (2) later to pick up his brother's horse "if he was of a mind to do so." By reason of the fact that Dan was pulling the horse trailer pursuant to the conversation with Ray, and Ray admitted on cross-examination that "if he (Dan) undertook that job and brought the horse home he would have been doing it for you (meaning Ray)", we believe the jury as triers of the facts might reasonably infer that when Dan first left Ingleside Track and turned west on Thomas Road, he thereby voluntarily submitted to the right of direction, supervision and control of Ray and became a servant engaged on his master's business, see Blashfield, Cyclopedia of Automobile Law and Practice, Vol. 5, §§ 2981, 2982. The fact Dan testified that before leaving the race track he had completely abandoned the idea of picking up the horse, is not necessarily controlling, because

it conflicts with inferences permissible from the physical facts.

But appellants urge that even if this be true, still there was such a deviation on Dan's part as to the route followed, that they were thereby absolved from liability, relying upon the pronouncements in the Arizona cases heretofore analyzed. See also 57 C.J.S., Master and Servant, § 574d (1) for a clear exposition of the doctrine. We agree with this contention. From the facts it indubitably appears that Dan knew the direct route to take to the stables, and therefore when he detoured by going south on 48th Street to the intersection where the accident occurred he had departed from his employment. In other words, whatever his purpose, whether (a) he was going to see Crawford and then on home, as he maintained, or (b) he was going to get his brother's horse after seeing Crawford, still it is our considered opinion that the evidence leads unerringly to the conclusion that his actions constituted an abandonment of the relation of master and servant, or a deviation to such an extent that the collision did not occur in the course and scope of the employment, and no contrary inference can properly be drawn from the facts.

The learned trial court therefore erred in denying appellants' motion for an instructed verdict. Judgment reversed, with directions to enter judgment for appellants.

STANFORD, C. J., and PHELPS, LA PRADE and WINDES, JJ., concur.