346 P.2d 146

**PHOENIX AUTO AUCTION, INC., a corporation, Appellant,**

v.

**STATE AUTOMOBILE INSURANCE ASSOCIATION, a corporation, Appellee.**

No. 6536.

Supreme Court of Arizona.

Nov. 5, 1959.

338

Langmade & Sullivan, Phoenix, and James F. Haythornewhite, Nogales, for appellant.

Perry & Perry and Raymond Huffsteter, Phoenix, for appellee.

ROYLSTON, Superior Court Judge.

The appellant, Phoenix Auto Auction, Inc., filed an action against Charles Wilson and Fred Capps, dba Miracle Mile Used Cars, and their surety State Automobile Insurance Association, a bonding company doing business in Arizona. The matter was tried to the court sitting without a jury. The trial court found in favor of appellant against defendants, Wilson and Capps, but in favor of State Automobile Insurance Association on appellant's claim against it. Phoenix Auto Auction, Inc. appeals from this latter finding. Defendants Wilson and Capps perfected no appeal from the judgment, so it has become final as to them. Phoenix Auto Auction, Inc. will be referred to as appellant, State Automobile Insurance Association as appellee, and Wilson and Capps as defendants, or by name.

Appellant is an Arizona corporation engaged in the business of operating an automobile auction in Phoenix. Wilson and Capps were, at all times material to this case, engaged as a co-partnership under the name Miracle Mile Used Cars, in Tucson. Wilson and Capps, as principals, and appellee, as surety, had executed and filed with the State of Arizona an automobile dealer's bond pursuant to A.R.S. § 28–1305. This bond was in effect at the time of the acts complained of.

Defendants Wilson and Capps had made 25 or 30 similar purchases from appellants during a period of 12 to 18 months prior to July 14, 1955. At each transaction, the defendants Wilson and Capps made payment by check which appellant would deposit in the normal course of business. On July 14, 1955, appellant's president, H. L. Boniface, sold a 1951 Cadillac to defendant Capps for $1,500. Payment was made by a check drawn on the Bank of Douglas, Tucson, Arizona, payable to Phoenix Auto Auction, Inc., and signed "Miracle Mile Used Cars by Fred Capps." Mr. Boniface testified that this particular transaction was no different from the other 25 or 30. The check was presented for payment at the drawee bank on July 22, 1955, at which time there were insufficient funds to cover the check, so it was returned to appellant. It was later presented for payment on August 23, 1955, but again was returned to appellant because there were insufficient funds in the account.

The chief clerk at the bank testified at the trial, and records reflecting the account of the Miracle Mile Used Cars were admitted in evidence. These records cover the period June to November, 1955. The account was normally active and showed sufficient funds on deposit to cover the check only on July 25, and for the five-day period August 11 through August 15. The records show slightly over $100 on the date the check was written, July 14, and slightly over $1,100 on the date presented, July 22. There was some $600 on the second date that the check was presented, August 23.

Although Wilson and Capps filed an answer to appellant's complaint, neither appeared at the trial and no attorney appeared in their behalf. The only testimony was that of appellant's president, Mr. Boniface, and the representative of the Bank of Douglas.

The only question which this court needs to determine is whether there was any evidence presented on which the trial court could find in favor of the bonding company and against appellant.

As stated numerous times by this court, the evidence, on appeal, must be construed in the light most favorable to sustaining the judgment. Hansen v. Oakley, 76 Ariz. 307, 263 P.2d 807. Appellant contends that where there is no conflict in the facts, this court is "not bound by the conclusions of the trial court, but are at liberty to draw our own legal conclusions from the admitted facts." Sanders v. Brown, 73 Ariz. 116, 238 P.2d 941, 943; Hansen v. Oakley, supra. This rule of law concerns the trial court's legal conclusions. In the instant case, the trial court was necessarily required to make a factual finding, i. e., whether there was an intent to defraud on the part of Wilson and Capps. The trial court, by its judgment, must have found no such intent. Is there evidence to support this implied finding?

Section 28–1305, supra, provides that the bond required "shall inure to the benefit of any person who suffers loss by reason of any unlawful act of the licensee." The meaning of the term "unlawful act", as used in this particular statute, has been construed in Commercial Standard Insurance Co. v. West, 74 Ariz. 359, 249 P.2d 830. We there adopted the rule set forth in Hartman v. Greene, 193 La. 234, 190 So. 390, 391, which states:

"The term 'an unlawful act' does not mean necessarily a criminal act; it means a wrongful act, or a tort—any wrongful act (not involving a breach of contract) for which a civil action will lie * * *."

Appellant contends that the act of Capps, in drawing the $1,500 check on July 14, not only falls within this definition of "unlawful act" but is sufficient to constitute a criminal violation of A.R.S. § 13–316, "Drawing check or draft on insufficient account with intent to defraud; etc." It is asserted that the trial court could correctly reach only one conclusion from the facts as stated. We disagree. The trier of fact must needs have decided as a factual question, "Was there an intent to defraud?"

Is it useless to summarize appellant's arguments leading to the conclusion that such an intent existed. The question is not whether any member of this court, sitting as a trier of fact in this case, would have reached the same conclusion the trial court reached, but whether there

is any competent evidence to support the conclusion arrived at by that court. We hold the record contains evidence to support the implied finding of the trial court.

The testimony disclosed that this particular transaction was no different° from 25 or 30 other transactions between the same parties. No oral representations were made at the time the check was given. Three days after the check was first presented to the drawee bank there were sufficient funds to cover the check. Approximately two to three weeks later there were sufficient funds to have covered the check for a period of five days.

■ The burden of proving an intent to defraud was on the appellant. The trial court from the evidence could reasonably conclude appellant had not carried that burden and that Wilson and Capps merely breached their contract with appellant, and that therefore, Wilson and Capps were liable for the sum of $1,500; but since there was nothing more than a breach of contract, appellee-surety was not liable under its bond.

Judgment affirmed.

STRUCKMEYER, UDALL and JOHNSON, JJ., concur.

NOTE. Justice CHARLES C. BERNSTEIN, having been the trial judge, disqualified, and Honorable ROBERT O. ROYLSTON, a judge of the Superior Court of Pima County, was called to sit in his stead.

PHELPS, Chief Justice (dissenting).

I have carefully read the majority opinion in this case and it causes me to again exclaim with Pascal "How ludicrous is reason, blown by a breath in every direction." The conclusion reached by the majority in this case is irreconcilably contradictory to the plain language used in two criminal cases previously decided by this Court where proof beyond a reasonable doubt of "intent to defraud" was required, whereas, in the instant case "intent to defraud" is established by a mere preponderance of the evidence.

In State v. Meeks, 30 Ariz. 436, 247 P. 1099, 1100, the defendant was charged with giving an insufficient fund check to pay a past-due debt. Defendant contended under such circumstances there could be no intent to defraud for the reason that the person to whom the check was given parted with no new consideration at the time, hence he was not defrauded. Defendant was convicted and upon appeal to this Court we said it was not necessary to prove the payee was actually defrauded. That

"* * * the offense is complete when it is shown that the defendant gave the check, representing thereby that it was good and valid and would

*pay the indebtedness, knowing at the time that he had no funds to meet it, and therefore that it was absolutely worthless. * * ****"* (Emphasis ours.)

And in State v. Ellis, 67 Ariz. 7, 189 P.2d 717, 719, in which the defendant Ellis was charged with passing a false or bogus check, under the provisions of Section 43-2614, A.C.A.1939, this Court made a still stronger statement on the precise issue presented here. Justice Udall authored the opinion and said:

" 'The general rule is that the making and delivery of a check amounts to a representation that the check is good and *that a representation extrinsic to the check itself* is not a necessary element of an offense under worthless check acts.' " Citing cases. (Emphasis ours.) 22 Am.Jur., False Representations, Sec. 64, p. 477. (Note: "Worthless check acts" must have been intended to include the insufficient fund check act.)

I agree that the above excerpt is a correct statement of the general rule of law and I assert that there is not the slightest difference in the legal principle involved in that case and the instant case. In each case *by making and delivering the check to the drawee the maker thereby represented to such drawee* that: *"This check is valid and will be paid on presentation to the bank on which it is drawn."* In each case the maker then knew that there were no funds in the bank sufficient to cover such check. In each case the persons to whom the checks were given accepted those representations as true, and believing them to be true parted with valuable property, and accepted said checks in full payment thereof.

The stark truth is that on July 14 at the time Capps drew the $1,500 check in this case as payment in full to appellant for a Cadillac car then delivered to him, there was exactly $114.06 in the Bank of Douglas to the credit of the partnership and he knew there had not been a single day, hour or minute since the previous June 14 (30 days previously) when there had been sufficient funds to their credit in the bank to pay said check, nor was there on deposit with the bank sufficient funds to pay said check on a single day until the following August 11, except there may have been $1,546.33 in the bank for a very short period on July 25.

The record shows a deposit of $399.26 was made by the partnership on July 25, making a total of $1,552.48 on deposit. This could have been made just before the bank closed that day. $6.05 was withdrawn on July 25, and on July 26 checks in the respective sums of $5, $923.32, and $563.74 were charged against this balance on July 26. It is not only possible but entirely probable that they were all drawn on July 25 or drawn and presented within minutes

after the bank opened on July 26. When cashed they left a balance of $53.77. When they drew these checks they knew the $1,500 check given to appellant eleven days previously had not been paid. They also knew that if it had been paid there were no funds remaining in their account to pay the checks presented on July 26.

Can we as reasonable men draw any other inference from the above facts than that Capps knew absolutely that for a period of thirty days prior to the date he made and delivered the check to appellant their partnership account with the Bank of Douglas had been insufficient to pay said check and that it was woefully insufficient to pay the check on the day it was issued and delivered?

Neither Capps nor Wilson, parties defendant to this action, appeared at the trial of this case to testify. Why did they not do this? The answer is trumpet tongued. They knew their bank account on July 14 was only $114.06, and they then knew they had no immediate prospects of receiving from any source sufficient funds to pay said check. If they had no intent to defraud appellant would they not have been eager to appear at the trial and explain, under oath, that on June 14 they honestly expected to make a deal or had already consummated a deal that assured the payment of said check upon presentation? Would that not have been the natural thing for them to do if they had no

intent to defraud appellant? Here again, reasonable men should not differ as to the reason for their failure to do so. Yet, the majority chose to ignore these important facts which to me, compel the conclusion that Capps clearly intended to defraud appellant when he delivered his check to appellant and drove the Cadillac car away.

The majority seem to say that because Capps and Wilson had purchased 25 or 30 cars from appellant during the 18 months immediately preceding the transaction here involved and that this transaction was handled according to routine, therefore, an intent to defraud could not possibly be present in the instant case. The conclusion is non sequitur. Conceding that an intent to defraud was not present in previous transactions with appellant that fact cannot have sufficient probative value to establish lack of fraudulent intent in the instant case in the face of facts which we have previously held to conclusively establish such fraudulent intent beyond a reasonable doubt.

The intent to defraud may have been conceived when Capps left Tucson to come to Phoenix to purchase a car from appellant. On the other hand, is it not plausible to infer that previous transactions with appellant were a part of the scheme, a "come-on" as it were, to establish a business relation that would not admit of even a suspicion of fraud in order to enable them to do exactly what they did do, that is, get a

good Cadillac car for nothing? I do not pretend to say that this transaction was a part of such a fraudulent scheme by defendants Capps and Wilson, but I do intend to say that it is more logical than the conclusion reached by the majority that the evidence did not clearly establish their intent to defraud appellant in this particular case.

It appears to be the position of the majority of the Court that because the appellant didn't stand in front of the teller's window at the Bank of Douglas in Tucson from July 14 until July 25, when they claim the money was available to pay it, appellant lost its legal right to recover against the guarantor on its bond. As above intimated, I believe it to be extremely doubtful if appellant's agent had appeared at the teller's window on July 25 that he would have collected his debt unless he had been waiting there first in line when the window opened. If he was unsuccessful on July 25 the majority then would require him to continue his vigil at said window until August 11 when the money was again available for the payment of said check. Unless appellant did just that, it appears the majority would not be willing to say that Capps gave the check to its agent with intent to defraud and permit a recovery in this case.

The law imposes no such burden upon the appellant. If it does business men cannot afford to accept a check from anyone.

According to the majority opinion if there have been similar previous transactions with a person and his checks have been previously honored, this fact creates a shield of honesty which an intent to defraud cannot penetrate however strong the proof of fraudulent intent may be. Appellant presented the check in question to the bank on two separate occasions—once just after the check was delivered, when it was deposited with the Valley Bank and was returned in three or four days with slip attached, marked insufficient funds. It was again presented for payment on August 23rd. At that time there was a balance of $666.67 to the credit of the maker of the check.

If the intent of Capps to defraud appellant out of the Cadillac car could have been photographed in technicolor such a picture to my mind could not have more clearly portrayed his intent to defraud appellant than the undisputed facts of this case. When the title to the Cadillac car was released to Capps by appellant it was done in consideration of Capps giving appellant the partnership check in the sum of $1,500 in full payment thereof which, according to State v. Ellis, supra, constituted an unequivocal representation to appellant "that the check is good and that a representation extrinsic to the check itself is not a necessary element of an offense under the worthless check acts * * *." [67 Ariz. 7, 189 P.2d 719.]

I am convinced that if the opinion is handed down as written its adverse impact upon the business of merchants and others will be terrific. The greater part of business transactions involves the acceptance of checks in payment of goods purchased and in the payment of accounts due for previous purchases, etc. The burden imposed upon business by the majority opinion cannot be met without assuming a risk so hazardous that no one can afford to assume it.

The judgment of the lower court should be reversed.