**ANTHONY EQUIPMENT CORP. d/b/a Anthony Crane Rental, L.P., Appellant,**

v.

**IRWIN STEEL ERECTORS, INC., Appellee.**

No. 05–02–00676–CV.

Court of Appeals of Texas, Dallas.

Aug. 20, 2003.

Rehearing Overruled Sept. 29, 2003.

D. Patrick Long, Jennifer L. Keefe and Nishita S. Shah, Patton & Boggs, L.L.P., Dallas, for Appellant.

Daniel D. Davis, Davis Law Firm, Dallas, for Appellee.

John D. Ovard, pro se.

Before Justices WRIGHT, FARRIS,[1]

1. The Honorable David F. Farris, Retired Justice, Second District Court of Appeals, Fort Worth, Texas, sitting by assignment.

and ROSENBERG.[2]

## OPINION

Opinion by Justice BARBARA ROSENBERG (Assigned).

Irwin Steel Erectors, Inc. (Irwin) sued Anthony Equipment Corp. d/b/a Anthony Crane Rental (Anthony) for damages arising from a construction incident.[3] In three issues, Anthony argues (1) the trial court erred in rendering judgment against Anthony on the negligence issue because Anthony conclusively established its borrowed servant defense; (2) the trial court erred in admitting any evidence concerning Irwin's lost profits; and (3) the evidence is insufficient to support the award of lost profits to Irwin. In four issues on cross-appeal, Irwin claims that the trial court erred in granting Anthony's motion for judgment notwithstanding the verdict on the issues of (1) cost of repairs; (2) reasonable trial and appellate attorney's fees; and (3) Anthony's failure to perform in a good and workmanlike manner. Resolving Anthony's and Irwin's issues against them, we affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In October 1996, Irwin was hired as a subcontractor to erect the steel structure for an arena on the Texas A & M University campus. Irwin rented a crane and an operator from Anthony. James Irwin, Irwin's owner, planned to raise a T–3 steel truss by "tandem lift," in which Irwin's crane, operated by Irwin's operator, in tandem and with the help of Anthony's crane, operated by Ed Cotton, would lift the trusses.

Anthony delivered the crane and operator on October 28. James directed Cotton where to set up the crane and described how the lift was to be conducted. The truss lift occurred on October 29. By using hand signals, James signaled the crane operators to lift the truss, slow down, or stop. When the truss reached the eighty-foot mark, Cotton intentionally released his end of the truss, without any direction from James to release. The truss fell to the ground causing property damage to the arena and Irwin's crane.

Irwin sued Anthony for negligence, breach of contract, breach of the implied warranty to perform in a good and workmanlike manner, and a knowing violation of the Texas Deceptive Trade Practices Act (DTPA). Irwin sought lost profits, cost of repairs, and attorney's fees. Anthony filed a general denial and asserted affirmative defenses, including the borrowed servant defense. A pretrial hearing was held pursuant to Anthony's objections to James Irwin's expert testimony on cost of repairs and lost profits. The trial court orally ruled that James could testify to lost profits, but the court reserved ruling on James's competence as a witness on cost of repairs until after trial.

Anthony moved for directed verdict on grounds that its borrowed servant defense was conclusively established and Irwin could not recover lost profits as a matter of law. The court denied the motion. The jury returned a verdict in favor of Irwin on the issues of negligence, breach of the implied warranty of good and workmanlike manner, and a knowing violation of the

---

2. The Honorable Barbara Rosenberg, Former Justice, Court of Appeals, Fifth District of Texas at Dallas, sitting by assignment.

3. Irwin and Anthony were named as defendants in the original petition in this case. Subsequently, Irwin asserted cross claims against Anthony. No other parties in the original action are parties to this appeal.

DTPA. The jury returned a verdict in favor of Anthony on the issue of breach of contract. After the jury returned its verdict, Anthony moved for judgment notwithstanding the verdict on all issues returned in Irwin's favor. The trial court denied Anthony's motion on the borrowed servant doctrine and the lost profits issue and granted its motion on the issues of implied warranty for good and workmanlike manner and cost of repairs. Irwin moved for entry of judgment and judgment notwithstanding the verdict on the contract and attorney's fees issues. The trial court denied Irwin's motion. The trial court awarded Irwin $351,461 in actual damages, pre- and postjudgment interest, and costs of court. This appeal followed.

### BORROWED SERVANT DEFENSE

In its first issue, Anthony contends that the trial court erred in rendering judgment against Anthony on the negligence issue because it established its borrowed servant defense as a matter of law. Specifically, Anthony contends that the evidence conclusively established that Irwin had the right to control Cotton's actions because: (1) James was in control of the tandem lift pursuant to Occupational Health and Safety Act (OSHA) regulations; (2) Irwin entered into a contractual agreement that designated Cotton as a borrowed servant; and (3) James directed and supervised the project and Cotton was under his exclusive control.

### Standard of Review

■ After the trial court denied Anthony's motion for directed verdict on the borrowed servant defense, the jury was asked whether Cotton was acting as Irwin's borrowed servant.[4] The jury answered in the negative. Because Anthony is attacking the adverse finding to an issue upon which it had the burden of proof, we treat Anthony's challenge as if it were asserting that it had established its borrowed servant defense as a matter of law. *See Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989). A party attempting to overcome an adverse fact finding as a matter of law must surmount two hurdles. First, we examine the record for evidence that supports the jury's finding, while ignoring all evidence to the contrary. Second, if there is no evidence to support the fact finder's answer, then the entire record must be examined to see if the contrary proposition is established as a matter of law. *Id.* Thus, if there is any evidence of probative force that supports the adverse finding, Anthony's challenge must fail. *Holley v. Watts*, 629 S.W.2d 694, 697 (Tex.1982).

### Applicable Law

■ A general employee of one employer may become the special employee or borrowed servant of another employer. *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 537 (Tex.2003); *Sparger v. Worley Hosp., Inc.*, 547 S.W.2d 582, 583 (Tex.1977). Whether a general employee of one employer has, in a given situation, become the special or borrowed employee of another employer is often a difficult question, particularly when the employee is furnished with machinery by his general employer to accomplish part of a project or contract undertaken by another. *Producers Chem. Co. v. McKay*, 366 S.W.2d 220, 225 (Tex. 1963). Resolution of the question rests in

4. Question 11 included the following definition: "One who would otherwise be in the general employment of one employer is a 'borrowed employee' of another employer if such other employer or his agents have the right to direct and control the details of the particular work inquired about."

the right of control of the manner in which an employee performs the services necessary to accomplish his ultimate obligation. *Id.* If a general employee of one employer is placed under control of another employer in the manner of performing his services, he becomes the other employer's special or borrowed employee. *Id.* If the employee remains under control of his general employer in the manner of performing his services, he remains the employee of the general employer, and the general employer is liable for the consequences of the employee's negligence. *Id.* (citing RESTATEMENT (SECOND) OF AGENCY § 227 (1958)). "[W]e must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary cooperation, where the work furnished is part of a larger undertaking." *Standard Oil Co. v. Anderson,* 212 U.S. 215, 222, 29 S.Ct. 252, 53 L.Ed. 480 (1909).

### OSHA Standard and "Right of Control"

First, Anthony contends that the individual with the "right of control" is established by regulations promulgated under OSHA. *See* 29 C.F.R. § 1910.6(a), (e)(20) (2002) (providing that American National Standards Institute "Safety Code for Crawler, Locomotive, and Truck Cranes" is OSHA standard). The truck crane standard provides, in part:

When two or more cranes are used to lift one load, one designated person shall be responsible for the operation. He shall be required to analyze the operation and instruct all personnel involved in the proper positioning, rigging of the load, and the movements to be made. *Id.* § 1910.180(h)(3)(xii).

Irwin complied with the above OSHA regulation, making James the sole party responsible for the planning and operation of the lift. Anthony claims that the OSHA standard precludes a general employer from maintaining control over a loaned employee because there can only be "one designated person responsible for the operation." According to Anthony, compliance with this regulation would necessarily give Irwin "right of control."

The purpose of OSHA is "to assure so far as possible every working man and woman in the nation the safe and healthful working conditions and to preserve our human resources." 29 U.S.C.A. § 651(b) (West 1999). OSHA is a safety code that neither enlarges nor diminishes "common law or statutory rights, duties, or liabilities of employers or employees under any law with respect to injuries ... arising out of, or in the course of, employment." *Id.* § 653(b)(4); *see Melerine v. Avondale Shipyards, Inc.,* 659 F.2d 706, 709 (5th Cir.1981); *Barrera v. E.I. Du Pont De Nemours & Co.,* 653 F.2d 915, 920 (5th Cir.1981) (holding that OSHA only creates duty between employer and employee, not between employers and third parties). The OSHA standard quoted above relates to the operational safety of a dual crane lift on the job site, not the right of control necessary to establish the borrowed servant defense. We conclude that the OSHA standard does not establish as a matter of law that Irwin had the "right of control" over Cotton so as to make Cotton Irwin's borrowed servant.

### Express Right of Control

Next, Anthony claims that the terms and conditions of the crane rental agreement between Irwin and Anthony expressly assigned the "right of control" to Irwin. Irwin responds that the parties' agreement was an oral request by James for a crane and operator, memorialized in a job work order that did not expressly provide for Irwin's "right of control" of Cotton.

Texas courts have consistently held that two employers can contractually agree to assign "right of control." *Bucyrus–Erie Co. v. Fogle Equip. Corp.*, 712 S.W.2d 202, 204 (Tex.App.-Houston [14th Dist.] 1986, writ ref'd n.r.e). With such an agreement, the court can decide the borrowed servant issue without considering the facts and circumstances of the project. *Id.* (citing *Producers Chem. Co.*, 366 S.W.2d at 226). When the parties have an agreement, the analysis becomes relatively simple. *Producers Chem. Co.*, 366 S.W.2d at 226. It becomes an issue of existence and enforceability of the contract. *See, e.g., Rorie v. City of Galveston*, 471 S.W.2d 789, 792–94 (Tex.1971); *Magnolia Petroleum Co. v. Francis*, 169 S.W.2d 286, 287–88 (Tex.Civ. App.-Beaumont 1943, writ ref'd).

Anthony argues the parties' agreement is the "Standard Short Term Crane Rental Agreement" that James signed at Cotton's request just before the lift began. One of the terms provides that Anthony's employees "are under [Irwin's] exclusive jurisdiction, supervision and control." James testified that he did not read this term and believed that he was signing the short term crane rental agreement to start Cotton's time on the job and begin the hourly charges. Ricky Howard, Anthony's salesman who negotiated the rental with James, testified that he did not require James to agree to the terms and conditions on the crane rental agreement before agreeing to ship the crane.

Irwin presented evidence that the agreement between the parties was an oral agreement that did not include any provision for the "right of control." Specifically, James testified that his agreement with Anthony was his oral order to Howard for a specific crane and qualified operator, for a quoted price. James had previously established an "open account" with Anthony by providing financial and credit informa-

tion to Howard. The oral order was memorialized on a crane rental job work order, showing the agreed price for "move in and move out" and the hourly crane operation rate. But the job work order did not include any clause relating to supervision and control. This is some evidence that the parties' agreement did not expressly assign the right of control over Cotton to Irwin. Because there is some evidence supporting the finding that Cotton was not Irwin's borrowed servant pursuant to an express agreement, we conclude that Anthony failed to conclusively establish its borrowed servant defense based on the express right of control.

### Supervisor's "Right of Control"

Last, Anthony argues that James's role as the sole supervisor for the job and the only person directing and controlling the project gives Irwin the requisite "authoritative direction and control" over Cotton such that Cotton was Irwin's borrowed servant. *See Producers Chem. Co.*, 366 S.W.2d at 225 ("Solution of the question rests in right of control of the manner in which the employees perform the services necessary to accomplishment of their ultimate obligation."). Irwin responds that applying the standards provided by the Restatement on Agency and *Producers Chemical Co.* to the facts and circumstances of this case shows that Irwin's direction to Cotton was for "necessary cooperation," not the "authoritative direction and control" needed to establish the borrowed servant doctrine. *See id.* at 225–26 (quoting *Anderson*, 212 U.S. at 222, 29 S.Ct. 252).

When the contract between employers regarding right of control over an employee is only implied or contains no provision for right of control, the right of control is necessarily determined as an inference from the facts and circum-

stances. *Id.* at 226. The Restatement provides that, in the absence of contrary evidence, there is an inference that the actor remains in his general employment so long as he is performing the business entrusted to him by the general employer. RESTATEMENT (SECOND) OF AGENCY § 227(b) (1958). There is no inference that because the general employer has permitted a division of control, he has surrendered it. *Id.* The court must then determine if there is contrary evidence suggesting the general employer had surrendered control to the special employer. *Producers Chem. Co.,* 366 S.W.2d at 226. When determining how much control has been surrendered, a court should weigh the factors enumerated in section 227(c) of the Restatement. *Id.* Pertinent to this case, section 227(c) provides:

> [A] continuation of the general employment is indicated by the fact that the general employer can properly substitute another servant at any time, that the time of the new employment is short, and that the lent servant has the skill of a specialist.

> A continuance of the general employment is also indicated in the operation of a machine where the general employer rents the machine and a servant to operate it, particularly if the instrumentality is of considerable value. Normally, the general employer expects the employee to protect his interests in the use of the instrumentality, and these may be opposed to the interests of the temporary employer. If the servant is expected only to give results called for by the temporary employer and to use the instrumentality as the servant would expect his general employer would desire, the original service continues. Upon this question, the fact that the general employer is in the business of renting machines and men is relevant, since in such case there is more likely to be an intent to retain control over the instrumentality. A person who is not in such business and who, gratuitously or not, as a matter not within his general business enterprise, permits his servant and instrumentality to assist another, is more apt to intend to surrender control.

RESTATEMENT (SECOND) OF AGENCY § 227(c).

◼ Here, the evidence showed that Cotton was a specialist in operating the American 440 crane and had participated in many two-crane lifts. Cotton testified that the decision where to put the crane in relation to the truss was his, and that he calculated his share of the load to determine whether the configuration of cranes was capable of holding the assigned load. Cotton testified that he had determined the load share "literally hundreds of times before." Cotton testified that James talked to him "briefly" about how the lift would be conducted, specifically that the truss would be lifted for repairs and then there would be other stops. Cotton testified that he knew how to follow James's hand signals and therefore "had no problem with whatever Mr. Irwin was going to do on the way up." Cotton's testimony showed that he operated the brakes and gears of the crane to raise the truss, taking direction from James as to stopping and starting the crane on the ascent. Moreover, the crane was a complex piece of equipment, weighing 165 tons, and was of considerable value. Witnesses testified that Anthony is one of the largest crane rental businesses in the country. The evidence also showed that Anthony paid Cotton's wages. The inference from the testimony was that Anthony could replace Cotton as the crane operator but that Irwin could replace Cotton only by requesting that Anthony replace Cotton with another Anthony employee. Because of the nature of the general project, a tandem truss lift, we conclude that James's di-

rections as supervisor of the lift were necessary for safety and cooperation between the two cranes in the lift. But James did not have direction and control over Cotton's manner of operating the crane during the lift. Applying the Restatement's standards regarding the rental of a valuable machine and operator to these facts, we conclude that there was evidence Cotton was expected to give the results called for by Irwin in raising the truss, but used the crane as Anthony expected, thus supporting the jury's finding that Cotton was not Irwin's borrowed servant.

Nevertheless, Anthony relies on *Hilgenberg v. Elam*, 145 Tex. 437, 198 S.W.2d 94 (1946), to argue that Irwin had the "authoritative direction and control" over Cotton's manner of operating the crane because James alone directed and controlled the tandem lift. In *Hilgenberg*, the lessee, a building contractor, sublet a tractor, bulldozer, and driver to Hilgenberg, a farmer, to remove trees and dig a surface water tank. *Id.* at 95. When driving backwards to uproot trees, the tractor-bulldozer ran over and killed Hilgenberg. *Id.* Hilgenberg had directed the work for about six weeks and was directing the driver where to remove trees and excavate. Unlike *Hilgenberg*, Anthony is in the business of renting cranes and operators. Unlike *Hilgenberg*, Anthony's rental was for a short duration, a truss lift, as part of a larger steel erection undertaking. Unlike *Hilgenberg*, James did not have complete supervision and control of Cotton's crane because Cotton determined where to locate the crane and the crane's load capability. *See id.* at 96. Thus, we cannot conclude that *Hilgenberg* supports Anthony's argument Irwin had the "sole authority" to show Cotton where to work and what to do such that Cotton became Irwin's borrowed servant. *See id.* at 95.

Anthony also relies on *Aguilar v. Wenglar Construction Co.*, 871 S.W.2d 829, 831 (Tex.App.-Corpus Christi 1994, no writ). In *Aguilar*, a manufacturer hired a construction company to repair its facility. The plant manager instructed several of its employees, including Aguilar, a general laborer, to help the construction company's employees replace a conveyer belt. The workers were supervised by a construction company supervisor. While a construction employee was driving a truck to pull the belt into place, the belt injured Aguilar. In concluding that Aguilar became the borrowed servant of the construction company, the court concluded that there was no dispute that the construction company had the right to control the details of the work done by Aguilar. The court reasoned that its "foreman controlled such basic things as where Aguilar stood and what he physically did to help repair the belt, a process with which Aguilar had no training, skill or experience, and on which he needed basic guidance in order to perform." *Id.* at 832. Unlike the laborer in *Aguilar*, the evidence shows that Cotton was an experienced specialist in using the crane and was responsible for calculating the crane load and operating the crane. Even though James directed the lift, his direction was for coordination between the two cranes, not the "basic things" about the laborer's help that the foreman controlled in *Aguilar*.

Both parties rely on *Producers Chemical Co.* In that case, Canadian River, an oil and gas drilling company, rented a compressor from Producers, which also sent a compressor operator, McDonald, and two other helpers, to help unload a hole in a well-drilling project. Canadian River directed McDonald where to hook up the compressor, when to start and stop, and the amount of pressure to apply. *Producers Chem. Co.*, 366 S.W.2d at 222, 225. The compressor exploded, injuring mem-

bers of the crew, because McDonald was negligent in continuing to operate the compressor after discovering that oil had escaped from the oiler, entered the outlet line, and combined with compressed air. *Id.* at 222–23. In deciding that McDonald and the helpers did not become the borrowed employees of Canadian River, such that Producers would be relieved of liability for their negligence, the supreme court considered the facts in light of the Restatement factors: proper operation of the compressor required an operator with some degree of technical knowledge; the length of the special employment was relatively brief; the operator was accountable only to Producers in determining whether the compressor was ready for use, when and where it needed oiling, and in continuing to operate it after discovering it was pumping oil, and Canadian River had no right to control and did not control these details of the operator's work; and there was no evidence that Canadian River could have replaced the operator with another operator of its own choosing. *Id.* at 226. "Mere directions given to McDonald as to where to hookup, when to start and when to shut down the compressor in coordinating the work of all men and machinery on the project toward the ultimate object of unloading the hole does not raise the issue that right of control of McDonald in the manner of performing his work had been transferred from Producers to Canadian River." *Id.*

Like *Producers Chemical Co.,* the crane in the case before us required an operator of some special skill; Cotton was accountable to Anthony for the operational readiness and use of the crane, and Irwin had no right to control, nor did it control, the operational details of the use of the crane; and there was no evidence Irwin could

have replaced Cotton with an operator of Irwin's choice. Like *Producers Chemical Co.,* in which the compressor was rented to unload a mud hole as part of the drilling project, Irwin rented the crane to help in the truss lift as part of a larger steel erection project. Thus, the inference is that the rental period was relatively brief. Like *Producers Chemical Co.,* James gave "mere directions" to Cotton regarding where to place the crane and when to start and stop the crane during the truss lift in coordinating the two cranes in the truss lift. *See id.* at 226. We conclude that *Producers Chemical Co.* does not support Anthony's argument that James's supervision of Cotton established its borrowed servant defense as a matter law.

The evidence that Irwin did not control the manner of operating the crane, despite James's direction regarding the tandem lift, supports the jury's negative finding on the borrowed servant issue. Therefore, we reject Anthony's argument that it conclusively established its borrowed servant defense based on Irwin's direction and supervision of the tandem lift.

Having rejected Anthony's arguments that it conclusively established its borrowed servant defense as a matter of law, we conclude that the trial court did not err in rendering judgment in Irwin's favor on the negligence issue. We resolve Anthony's first issue against it.

## LOST PROFITS

In the third issue, Anthony contends the evidence was insufficient to support the award of lost profits because Irwin's evidence was not based on objective facts, figures, or data from which lost profits could be reasonable ascertained.[5] Ir-

---

5. Anthony preserved error on its legal sufficiency challenge by moving for a directed verdict and for judgment notwithstanding the verdict. *See Cecil v. Smith,* 804 S.W.2d 509,

win responds that the evidence on lost profits was sufficient.

■ An appellant attacking the legal sufficiency of an adverse finding on an issue on which he did not have the burden of proof must demonstrate on appeal that there is no evidence to support the adverse finding. *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983). In reviewing a no evidence challenge, we consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *Southwest Key Program, Inc. v. Gil–Perez,* 81 S.W.3d 269, 274 (Tex.2002).

■ A party may recover lost profits only if it shows by competent evidence the amount of the loss with reasonable certainty. *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.,* 877 S.W.2d 276, 279 (Tex.1994). However, it is not necessary that profits should be susceptible to exact calculation; it is sufficient that there be data from which they may be ascertained with a reasonable degree of certainty and exactness. *Id.; Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992) ("As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained."). For example, when a business is already established and making a profit at the time the contract was breached or the tort committed, pre-existing profit, together with other facts and circumstances, may indicate with reasonable certainty the amount of profits lost. *Tex. Instruments,* 877 S.W.2d at 279.

■ What constitutes reasonably certain evidence of lost profits is a fact-intensive determination. *Id.* The requirement of "reasonable certainty" in the proof of lost profits is intended to be sufficiently flexible to accommodate the myriad of circumstances in which claims for lost profits arise. *Id.* Although supporting documentation may affect the weight of the evidence, it is not necessary to produce the documents supporting the opinions or estimates of lost profits. *Holt Atherton Indus., Inc.,* 835 S.W.2d at 84.

At trial, James testified that Irwin lost its 1998 bid for the United Spirit Arena as a result of the incident. James testified and introduced into evidence Exhibit 23 that showed the profit margin on Irwin's construction projects was 43.79%, the United Spirit Arena project was a one million dollar project, and, applying the profit margin percentage to that amount, the lost profits were $434,700. The jury awarded $250,000 in lost profits for the United Spirit Arena project in answer to the question regarding damages from Anthony's negligence.[6] Anthony challenges this jury answer, contending that Irwin failed to present a profit analysis for this project supported by objective facts or data because Irwin failed to present any evidence of the actual costs and profits of the United Spirit Arena to the eventual winner of the bid.

■ James testified that Irwin was an ongoing business and was making a profit at the time of the incident. He calculated the profit margin by adding his total receipts for the years 1993 through 1996, subtracting the operating costs and over-

---

510–11 (Tex.1991). However, Anthony did not preserve any error on its factual sufficiency challenge by filing a motion for new trial. *See id.;* Tex.R. Civ. P. 324(b)(2), (3). Therefore, we need not address its factual sufficiency challenge.

6. Irwin also presented evidence that it lost profits from another project. However, the jury awarded zero damages as to the second project. Irwin does not challenge that finding on appeal. Therefore, we do not consider it.

head costs to determine profit, and then dividing the profit by the total receipts to get a percentage of profits. He also testified that because Irwin was an established company, it had no debt to service, and its profit margin was higher than that of other construction companies. James testified that he learned Irwin lost the United Spirit Arena bid because the general contractor, Hirshfeld Steel, which was also the general contractor on the Texas A & M arena and Irwin's biggest customer in 1996, had "blackballed" Irwin because of the incident and the subsequent lawsuit. This is evidence that Irwin lost out on a specific contract because of this incident. *See id.* at 85. We reject Anthony's argument that this evidence fails to show that Irwin calculated its lost profits from one complete calculation. *See id.* We conclude that Irwin's evidence showed that it was an established business and making a profit when this incident occurred, and James's calculation of the company's pre-existing profit, together with the facts and circumstances of the loss of the United Spirit Arena bid, indicates with reasonable certainty the amount of lost profits.

Anthony also argues that Irwin was not entitled to lost profits because they were not foreseeable. Anthony relies on *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 687 (Tex.1981), for the proposition that actual damages are recoverable for breach of contract only if the loss is a natural, probable, and foreseeable consequence of the defendant's breach. However, Irwin recovered its damages for Anthony's negligence, not for any breach of contract. Therefore, whether any damages for breach of contract were foreseeable is irrelevant.

Because there is some evidence supporting the jury's award of lost profits for the United Spirit Arena, we resolve Anthony's third issue against it.[7]

## COST OF REPAIRS

In Irwin's first issue on cross-appeal, it contends that the trial court erred in granting Anthony's motion for judgment not withstanding the verdict on the issue of cost of repairs. Specifically, Irwin argues that James's trial testimony regarding cost of repair supports the jury's finding of $299,769.36 in cost of repairs. Anthony replies that the trial court properly granted its motion for judgment notwithstanding the verdict because Irwin's cost of repair evidence was not competent evidence and thus no evidence of cost of repairs.

■ A motion to disregard jury findings and for judgment notwithstanding the verdict should be granted: (1) when the evidence is conclusive, and one party is entitled to recover as a matter of law, or (2) when a legal principle precludes recovery. *John Masek Corp. v. Davis,* 848 S.W.2d 170, 173 (Tex.App.-Houston [1st Dist.] 1992, writ denied) (citing *Mancorp, Inc. v. Culpepper,* 802 S.W.2d 226, 227 (Tex.1990), and *Graphilter Corp. v. Vinson,* 518 S.W.2d 952, 953 (Tex.Civ.App.-Dallas 1975, writ ref'd n.r.e.)).

■ Rule of evidence 702 provides that a witness may testify as an expert: If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may

7. In its second issue, Anthony argues that the trial court erred in admitting any evidence regarding Irwin's lost profits. The trial court admitted the evidence following a hearing on Anthony's pretrial objection and then granted Anthony's motion for judgment notwithstanding the verdict. Therefore, we need not address Anthony's evidentiary issue.

testify thereto in the form of an opinion or otherwise.

TEX R. EVID. 702. The party offering the expert's testimony bears the burden to prove that the witness is qualified under rule 702. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 718 (Tex. 1998). The offering party must demonstrate that the witness "possess[es] special knowledge as to the very matter on which he proposes to give an opinion." *Id.* (citation omitted).

■■■■■ When personal property has been damaged, the general rule is that the damage is to be measured by the difference in the reasonable market value immediately before and immediately after the damage to such property. *Celanese Ltd. v. Chem. Waste Mgmt., Inc.*, 75 S.W.3d 593, 598 (Tex.App.-Texarkana 2002, pet. denied). If damaged property can be repaired adequately and fully, the difference in value before and after the damage to the item can be defined as the cost of the repairs. *Id.* When property has sustained damage that diminishes its fair market value, the cost of repairing or restoring the property to its full market value is an appropriate element of damage. *Id.*

■■■ James testified that he was an owner and the chief operating officer of Irwin. He testified that he discussed repairing the crane with Kirkpatrick & O'Donnell, a commercial equipment company and an FMC Linkbelt dealer. The dealer prepared a bid for the repairs. However, James rejected the bid and repaired the crane himself, using used parts and Irwin's labor. He had no record of the cost of the repairs he made. His evidence of the cost of repairs was the dealer's estimate of the 1996 cost of new parts and labor. The exhibit was a 2000 recreation of the 1996 bid that the dealer made for the repairs. The evidence showed that Irwin was a steel erection

company, not a dealer or repairer of cranes or other commercial equipment. Other than the repair of this damaged crane, there was no evidence that James or Irwin repaired cranes or that Irwin was in the business of repairing cranes. James testified that Irwin obtained repairs and parts from dealers. Although there was evidence that James had specialized knowledge about obtaining repairs and parts from dealers and selecting a crane repair company, the record does not show that James had any knowledge, skill, experience, training, or education by which to form an opinion as to the cost of repairs. Because there was no evidence that James had specialized knowledge on cost of repairs, the trial court did not err in granting judgment notwithstanding the verdict on this issue pursuant to rule of evidence 702.

Nevertheless, Irwin argues that James was competent as a lay witness to testify regarding repairs. Rule of evidence 701 provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

TEX.R. EVID. 701.

■■■ The fact in issue here is the cost of the repairs that Irwin made to the crane in 1996, with used parts. James testified that he did not know the cost of those parts and labor. His evidence of the cost of repairs was the dealer's estimate, which was for new parts. Further, he testified that the cost for the labor was reasonable, but he could not say if it was accurate. James relies on *Coker v. Burghardt*, 833 S.W.2d 306 (Tex.App.-Dallas 1992, writ de-

nied), to support his reliance on a third-party repair shop estimate as evidence of his cost of repairs. In *Coker*, a car owner familiarized himself with the cost to repair damage to his car by visiting area car repair shops. He then testified as to what the reasonable cost to repair his car might be. *Id.* at 310–11. Here, the estimate is a bid the dealer made in 1996 that James did not accept. Instead, James made the repairs himself, using replacement parts and Irwin's labor. He could not give an opinion from his personal knowledge what his actual cost of repairs were or that those costs were reasonable. Instead, he gave the opinion of a crane dealer's estimate of the cost of repairs that were not made. Therefore, the estimate does not represent James's personal knowledge of the actual cost of the repairs that James made, nor does it represent a bid that James accepted or would accept in the future, and is unlike the estimate in *Coker*. *See id.* at 309 ("The issue is whether the party testifying about the cost of car repairs *knew* what a reasonable charge was."); *see also Int'l Servs. Ins. Co. v. Hanna*, 515 S.W.2d 175, 176 (Tex.Civ.App.-Eastland 1974, no writ) (estimate of reasonable cost of repairing car properly admitted when owner familiarized himself with reasonable cost of repair in county, showing he knew value); *Allright, Inc. v. Lowe*, 500 S.W.2d 190, 192 (Tex.Civ.App.-Houston [14th Dist.] 1973, no writ) (receipted bills with proof of reasonableness admissible to show what injured party actually paid for repairs); *Nielson v. Okies*, 503 S.W.2d 614, 616 (Tex.Civ.App.-El Paso 1973, no writ) (estimate of cost of repairs admissible to show damages whether or not owner "has, yet, or will in the future, make the repairs of those injuries and damages"). Because James did not have personal knowledge of the cost of repairs, the trial court did not err in granting Anthony's motion for directed verdict pursuant to rule of evidence 701.

Because Irwin's only evidence of cost of repairs was inadmissible pursuant to either rule 701 or 702, the trial court did not err in granting Anthony's motion for judgment notwithstanding the verdict on this issue. We resolve Irwin's first issue on cross-appeal against it.

**ATTORNEY'S FEES**

In its second issue on cross-appeal, Irwin contends that the trial court should have rendered judgment for Irwin based on a finding of reasonable attorney's fees. The jury found that $600,000 was a reasonable attorney's fee for Irwin. Irwin argues that the jury's negligence finding supports a breach of contract claim entitling it to attorney's fees; that the jury did not find that there was no breach of contract; and that, reading the findings together, the jury found a breach of contract.

The case was submitted on theories of negligence and breach of contract. Irwin prevailed on the negligence claim. Question 1 asked whether the negligence, if any, of either Anthony or Irwin proximately caused the occurrence in question. Question 1 included a definition of "negligence" as "failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances." The jury found that Anthony was negligent and awarded Irwin damages. In contrast, Irwin lost on its contract issue. Question 4 asked whether Anthony failed to comply with the rental agreement between the parties, to which the jury responded "No." The jury did not answer the damages question relating to breach of

contract. Thus, Irwin submitted its case to the jury on both negligence and breach of contract theories and recovered damages under its negligence claim, but not under its breach of contract claim. Irwin essentially argues that both of these issues could be a finding of breach of contract. Thus, according to Irwin, the negligence finding supports a breach of contract. The acts of a party may breach duties in tort or contract or simultaneously in both. The nature of the injury most often determines which duty or duties are breached. *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex.1986). If the defendant's conduct gives rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may also sound in tort. *See id.* As a prerequisite to asserting a claim of negligence, there must be a violation of a duty imposed by law independent of any contract. *Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex.1991). Where the only duty between parties arises from a contract, a breach of this duty will ordinarily sound only in contract, not in tort. *Id.*

■ Here, as the negligence issue was pleaded and submitted to the jury, the negligence issue was not dependent on the contractual terms. Thus, the negligence issue was submitted as an independent tort and not as a breach of contract. Accordingly, we reject Irwin's argument that the trial court's finding that Anthony's negligence is in fact a breach of contract finding, not a negligence finding, or that there was any conflict in the jury's answers to Questions 1 and 4. Moreover, Irwin does not attack the jury's failure to find that Anthony breached the rental agreement or the jury's failure to award any damages caused by breach of the rental agreement. Because Irwin did not recover on its contract theory, it is not en-

titled to attorney's fees. *See* Tex. Civ. Prac. & Rem.Code Ann. § 38.001 (Vernon 1997) (person may recover reasonable attorney's fees, in addition to amount of valid claim and costs, if claim is for oral or written contract). Therefore, the trial court did not err in denying Irwin's motion for judgment and implicitly granting Anthony's motion for judgment notwithstanding the verdict on this issue. *See Mancorp, Inc.*, 802 S.W.2d at 227–28 (in reviewing judgment notwithstanding the verdict, appellate court (1) must determine that no evidence supports jury's findings; (2) is limited to reviewing only evidence tending to support jury's verdict and must disregard all contrary evidence to the contrary; and (3) upholds jury's finding if more than a scintilla of evidence supports finding). We resolve Irwin's second issue on cross-appeal against it. Because Irwin is not entitled to attorney's fees, we also resolve its fourth issue on cross-appeal, in which Irwin contends it was entitled to attorney's fees on appeal, against it.

## BREACH OF IMPLIED WARRANTY

In its third issue on cross-appeal, Irwin contends that the trial court erred in granting Anthony's motion for judgment notwithstanding the verdict on the issue of the implied warranty to perform in a good and workmanlike manner. The jury was asked whether Anthony failed to comply with a warranty that was a producing cause of damages to Irwin, and the jury answered in the affirmative. Anthony moved for judgment notwithstanding the verdict on this issue, arguing that there was no implied warranty under these facts.

■ "[I]mplied warranties are created by operation of law and are grounded more in tort than in contract." *Rocky Mountain Helicopters, Inc. v. Lubbock County Hosp. Dist.*, 987 S.W.2d 50, 52 (Tex.1998) (quoting *La Sara Grain Co. v.*

*First Nat'l Bank of Mercedes,* 673 S.W.2d 558, 565 (Tex.1984)). Implied warranties may be imposed either by statute or under the common law. *Id.* (citing *Parkway Co. v. Woodruff,* 901 S.W.2d 434, 438 (Tex. 1995)). The Texas Supreme Court has recognized an implied warranty for services only when the services relate to the repair or modification of existing tangible goods or property. *Id.* at 52–53 (citing *Melody Home Mfg. Co. v. Barnes,* 741 S.W.2d 349, 354 (Tex.1987)). Although the cranes lifted the truss for some repairs before it was to be lifted into place, those repair services were performed by Irwin, not Anthony. Anthony provided the services of the crane and operator to assist in the tandem lift, not to repair or modify tangible goods or property.

▮ An implied warranty that services will be performed in a good and workmanlike manner may arise under the common law when public policy mandates. *Id.* at 53 (citing *Melody Home Mfg. Co.,* 741 S.W.2d at 354). Public policy does not justify imposing an implied warranty for service transactions in the absence of a demonstrated, compelling need. *Id.* There is no compelling need for an implied warranty when other adequate remedies are available to the consumer. *Id.* Remedies may not be adequate when, for example, privity or reliance requirements or the difficulty of assigning responsibility prevent a wronged consumer from obtaining redress. *Id.* No such obstacles are present under the circumstances of this case. In fact, Irwin obtained a negligence finding against Anthony and pleaded breach of contract as well. We conclude the trial court did not err in granting Anthony's motion for judgment notwithstanding the verdict on the implied warranty issue. Because there is no implied warranty under these circumstances, we also reject Irwin's argument that there was a knowing breach

of the implied warranty pursuant to the DTPA. We resolve Irwin's third issue on cross-appeal against it.

## CONCLUSION

Having resolved Anthony's issues against it and Irwin's issues on cross-appeal against it, we affirm the trial court's judgment.