[Civil No. 3757. Filed February 23, 1937.]

[65 Pac. (2d) 35.]

LEE MOOR CONTRACTING COMPANY, a Corporation, Appellant, v. ELIZABETH L. BLANTON, Administratrix of the Estate of Thomas H. Blanton, Deceased, Appellee.

Messrs. Norris & Patterson, Mr. Charles L. Ewing, and Mr. Charles E. McDaniel, for Appellant.

Messrs. Cornick & Carr, Mr. W. T. Elsing and Mr. B. M. Partridge, for Appellee.

ROSS, J.—Elizabeth L. Blanton brought this action as administratrix for damages to her husband's estate, charging defendants Lee Moor Contracting Company and Lee Kiser with having caused his death through their negligent operation of a motor-truck. The Lee Moor Contracting Company, to which we shall hereafter refer as the company, was a general contractor for certain road construction, on United States Highway No. 89, between Ashfork and Prescott, and had hired from Lee Kiser a motor-truck with which to haul gravel from a gravel pit to what is designated as the "hot" plant, located on the road about five miles distant and in a southerly direction from the gravel pit. The general course of the highway is north and south. The gravel pit is located about one-half mile west of the highway, and from it the gravel pit road runs easterly until it gets within about one hundred feet of the highway, at which point it turns south and for a thousand feet parallels the highway and then gradually approaches and enters it at an angle of about forty-five degrees.

On August 23, 1934, as the Kiser truck, on its way to the "hot" plant, drove onto Highway No. 89, the Blanton automobile, driven by the deceased, Thomas H. Blanton, was coming from the north and, to avoid a collision with the truck was steered from the right to the left side of the road, where it overturned, injuring Blanton so that he died. There was no collision, and the driver of the Kiser truck did not know that the Blanton car had overturned or that anyone had been hurt until some time thereafter when another

gravel truck driver overtook him and told him what had happened.

The jury's verdict was against the company and in favor of Lee Kiser. The former has appealed from the judgment and the order overruling its motion for new trial.

Of many errors assigned, we first consider the one that the court committed error in refusing to grant defendant's motion for an instructed verdict at the close of the case, on the ground the evidence showed the driver of the motor-truck was not the servant of the defendant company.

The complaint alleges that the truck involved in the accident was owned by defendant Lee Kiser; that it was hired by defendant company and was being used by it; and that the driver was the servant of the company and Lee Kiser and under their direction, supervision, and control. It is the contention of the company that the evidence conclusively shows that it had hired the motor-truck and the driver thereof from Lee Kiser to haul gravel from the gravel pit to the "hot" plant on the road, and that the control, supervision, and direction of the truck and its driver were in Kiser and not in the defendant company. The plaintiff resists this proposition and insists the driver of the truck was the servant of the company.

█ It is the law that, where it is attempted to hold one responsible in damages for the negligence of another on the principle of *respondeat superior,* it is essential to show the one committing the wrong which caused the damage was in the doing of the act the servant of the person attempted to be charged. Whether the relation of master and servant between the one sought to be charged and the one committing the injury exists often is a very difficult question to determine.

"A servant is a person employed to perform service for another in his affairs and who, with respect to his physical conduct in the performance of the service is subject to the other's control or right to control." 1 American Law Institute, Agency, § 220. One may be in the employment of another without being a servant, as where he is working under an independent contract. The authors of the above text in their comments (page 485) say:

"The important distinction is between service in which the actor's physical activities and his time are surrendered to the control of the master, and service under an agreement to accomplish results or to use care and skill in accomplishing results. Those rendering service but retaining control over the manner of doing it are not servants. They may be agents, agreeing only to use care and skill to accomplish a result and subject to the fiduciary duties of loyalty and obedience to the wishes of the principal; or they may be persons employed to accomplish or to use care to accomplish physical results, without fiduciary obligations, as where a contractor is paid to build a house. An agent who is not subject to control as to the manner in which he performs the acts that constitute the execution of his agency is in a similar relation to the principal as to such conduct as one who agrees only to accomplish mere physical results. For the purpose of determining liability, they are both 'independent contractors' and do not cause the person for whom the enterprise is undertaken to be responsible. . . . "

The question then is: Was Kiser rendering service to the company in which he retained the control or right to control the physical conduct of the driver of the rented motor-truck in the accomplishment of results, or had he surrendered such control to the company? If the facts are that Kiser rented his truck with the service of a driver to haul gravel from the gravel pit to certain designated points on the road,

to be used by the company in the construction or improvement thereof, and in the performance of such work he had control or right of control of the conduct and acts of the truck driver, then the driver was his servant and he only would be responsible for his negligence. Whether a lent or hired servant continues the servant of his general employer, or becomes the servant of the borrower or hirer, is always a question of fact. Under some state of facts he may be the servant of one part of the time and the other the rest of the time. An example of a case where he is as to some of his acts the servant of one, and as to some of his acts the servant of the other, is where a general employer engaged in the business of hiring trucks to others lends or hires a motor-truck with a driver to another to haul, we will say, gravel from a gravel pit to points on a road construction job, the loading and unloading to be under the control or right of control of the borrower or hirer, while the mechanical operation, management, and care of the truck remain in the control or right of control of the driver between the points of loading and unloading. The text-books and decisions sustaining the proposition, that as long as the employee is furthering the business of his general employer by service rendered to another he is the servant of the former, are numerous. We give some of them: 1 American Law Institute, Agency, § 227, and illustrations; 5 Am. Jur., Automobiles, § 384; *Albert v. Hudson*, 49 Ga. App. 636, 176 S. E. 659; *Burns v. Eno*, 213 Iowa 881, 240 N. W. 209; *Thatcher v. Pierce*, 281 Pa. 16, 125 Atl. 302; *Babbitt v. Say*, 120 Ohio St. 177, 165 N. E. 721; *Independence Indemnity Co. v. Carmical & Woodring*, 13 La. App. 64, 127 So. 10; *Antonelly v. Adam*, 175 Minn. 438, 221 N. W. 716; *Gorman v. A. R. Jackson Kansas City Showcase Works Co.*, (Mo. App.) 19 S. W. (2d) 559; *Billig v. Southern Pac. Co.*, 189 Cal. 477, 209 Pac. 241; *Callahan v. Harm,*

98 Cal. App. 568, 277 Pac. 529 (hearing denied by Supreme Court); *Lacombe* v. *Cudahy Packing Co.,* 103 N. J. L. 651, 137 Atl. 538; *Densby* v. *Bartlett,* 318 Ill. 616, 149 N. E. 591, 42 A. L. R. 1406, and annotation at page 1416 et seq.

Speaking of a case whose facts involved the question we have, the Supreme Court of New York, through Mr. Justice CARDOZO (now Associate Justice of the Supreme Court of the United States), said:

"The rule now is that, as long as the employee is furthering the business of his general employer by the service rendered to another, there will be no inference of a new relation unless command has been surrendered, and no inference of its surrender from the mere fact of its division." *Charles* v. *Barrett,* 233 N. Y. 127, 135 N. E. 199, 200.

Control or right to control determines liability. *Grabe* v. *Industrial Commission,* 38 Ariz. 322, 299 Pac. 1031; *Swansea Lease, Inc.,* v. *Molloy,* 20 Ariz. 531, 183 Pac. 740.

■ The defendant contends that the driver of the truck was, at the time plaintiff's intestate was injured, under the control or right of control of Kiser, the owner of the truck, and not of defendant. We must look to the evidence to see if it sustains such contention. The defendant's superintendent E. H. Wallace, testified that defendant, on August 24, 1934, was doing work on a road construction project between Ashfork and Prescott, as follows:

"Q. At approximately that time, some time in that vicinity, did you enter into any arrangement on behalf of your company with Mr. Kiser *concerning one of his trucks?* (Italics ours.) A. Yes, sir.

"Q. Did that concern the truck which has been described during this testimony here? A. Yes, sir.

"Q. What was your arrangement with Mr. Kiser? A. We were hauling gravel from a pit near Paulden

to the hot plant about five and one-half miles this side, and we made an agreement with him to pay him so much a load.

"Q. How much a load? A. $1.25 a load.

"Q. What was he to do under the terms of that arrangement? A. They were just to go over to the gravel pit shovel and load up and haul a five-yard load down to the hot plant.

"Q. Did you arrange to pay his driver? A. The company paid all the drivers; yes, sir.

"Q. Just what deduction was made from the price per load? A. Whatever rate the drivers were allowed—68¾ cents.

"Q. You mean you deducted that from the price allowed for hauling gravel, is that it? A. Yes, sir.

"Q. So that the total price was $1.25? A. Yes, sir.

"Q. And Kiser got whatever was left after the payment of the driver? A. Yes, sir.

"Q. Who employed the driver? A. He was employed by Mr. Kiser.

"Q. Did you direct the manner in which the driver should handle his truck? A. No, sir.

"Q. You stated the complete contract between yourself and Kiser with reference to this particular truck? A. Yes, sir."

On cross-examination this witness stated, in effect, that defendant company had employees at the gravel pit who handled the loading shovel and loaded this Lee Kiser and other trucks; that the driver of a truck, when he arrived at the gravel pit, would drive to the loading place and when his truck was loaded would move on to the "hot" plant, where the rock crusher was located and the gravel piled, and there would receive from a checker, who was the company's employee, a check for his load, and unload either into the crusher or the store pile as directed by the checker. This witness, referring to the drivers, said: "It was immaterial to us when they got there (to work), or how many loads they hauled."

R. D. Canfield, a highway department engineer, testified:

"Q. Do you know whether or not Lee Kiser had a sub-contract on this job? A. Yes, he did.

"Q. What was the nature of that sub-contract? A. It was a contract to supply a truck to the general contractor. . . .

"Q. Do you know what the provision of the contract between Kiser and the contracting company was? A. No.

"Q. You do know, however, that Lee Kiser was renting some truck to the Lee Moor Contracting Company? A. Yes, sir.

"Q. Was he driving a certain Moreland three-ton truck with a five-yard steel body? A. Yes; he had one. . . .

"Q. On the 23rd day of August, 1934, do you know who was driving this Moreland truck? A. Truck-driver Wilson.

"Q. Do you know his full name? A. No, I don't. I can't recollect it.

"Q. Was it Ray B. Wilson? A. It seems that that is the name. I believe it is."

Ray B. Wilson, the driver of the truck, testified:

"Q. On August 23, 1934, were you driving a truck out on the construction job on the Prescott-Ashfork Highway? A. Yes, sir.

"Q. Was that Moreland three-ton truck with a five-yard steel body owned by Mr. Kiser? A. Yes, sir.

"Q. You were paid for your services? A. Yes, sir.

"Q. By whom were you paid? A. Lee Moor Construction Company."

In his cross-examination he said:

"Q. When you say you were paid by the Lee Moor Contracting Company, do you mean that you received your check from them? A. Yes, that is the driver's check.

"Q. You do not know the manner in which that money was procured? A. Well, no.

"Q. You don't know whose money it was except the fact that you got your check? A. Yes, I got my check."

Defendant Lee Kiser testified for defendants:

"Q. Mr. Kiser, on August 23, 1934, where were you working? A. For the Lee Moor Construction Company.

"Q. Where? A. Chino Valley.

"Q. On the road job? A. Yes, sir.

"Q. Where were you on the afternoon of August 23? A. I was in camp.

"Q. Where is the camp? A. About six miles South of the hot plant.

"Q. South of the hot plant? A. Yes.

"Q. Where is that in relation to the so-called gravel pit? A. Well, the gravel pit is three or four miles or maybe five North of the hot plant.

"Q. Were you advised of an accident that afternoon on the highway in that vicinity? A. Yes.

"Q. Who advised you? A. Ray Wilson."

It must be admitted that this evidence, on the vital issue of whose servant Ray Wilson was, is, to say the least, very unsatisfactory. In a way, it shows the renting of the truck with the driver by Kiser to the company, with the control or right of control in the company in the loading and unloading of the gravel, and the control or right of control in the operation of the truck between the termini in the driver. No witness, however, testified that the truck and driver were rented together. Wallace, the superintendent of the defendant company, testified, in effect, that the company made an agreement to pay Kiser $1.25 a load, which included "the rate the drivers were allowed, 68¾ cents," and that "the company paid all the drivers." It is nowhere explained whether this rate to the driver was fixed by agreement between the company and the driver or between the owner of the truck and the driver. It is true the evidence is that

Wilson, the driver, was hired by Kiser; but the evidence also shows that Kiser was working for the Lee Moor Contracting Company on this job, and it might have been that it was as an employee of the company that Kiser hired Wilson to drive the truck. It will be noticed that Wallace, the superintendent, was asked what, if any, arrangement was made with Kiser "concerning one of his trucks," and not one of his trucks with a driver. Also that he said: "We (the company) were hauling gravel . . . and we made an agreement with him to pay him so much a load." Canfield, the highway department engineer, testified that Lee Kiser had a contract "to supply a truck to the general contractor." There is no showing that Kiser was engaged in the business of renting trucks to others.

Many of the factors (1 American Law Institute, Agency, § 220) usually present in a case of this kind that tend to throw light upon the question, in whose business was the driver engaged? were not elicited from the witnesses. Apparently both sides were afraid to go to the bottom of the question and while, perhaps, it was to the advantage of the plaintiff to thus leave it in the air, it seems equally clear that the defendant should have shown definitely the relation the driver sustained to it and also to Kiser.

While, perhaps, there is no conflict in the evidence as to whose servant Wilson was at the time of the accident in which Blanton was injured, we think the evidence leaves this issue in so much doubt that reasonable persons might well come to different conclusions as to who had the control or right of control at the time. When such is the case its solution, under proper instructions, is for a jury. The annotators in *Densby* v. *Bartlett, supra,* 42 A. L. R. 1418, say:

"Ordinarily, the relation of master and servant is left for the jury to determine under proper instructions, though, as will be observed from some of the

cases, the determination of that relationship may become one for the court, where the evidence is clear and uncontradicted. . . . " The evidence is not clear.

The company's motion for an instructed verdict at the close of the case was properly denied.

 The next error assigned is a ruling of the court admitting, over the defendant's objection, certain opinion evidence. R. D. Canfield, the representative of the highway department supervising the road construction work, was testifying for plaintiff and the following proceedings took place:

"Q. You have stated that you examined the scene of the accident and the general situation there, Mr. Canfield. The testimony in this case by Mrs. Blanton is that the car was traveling at between thirty-five and forty miles and not to exceed forty miles an hour just before this truck came on the highway in front of it. In view of the general conditions there, would you say that the speed of from thirty-five to forty miles an hour was driving a car in a careful, lawful and prudent manner and a careful and prudent speed, reasonably proper and safe, with regard to the traffic, the surface and width of said highway and the conditions then existing?

"Mr. Ewing: We object to that as calling for a conclusion of the witness and for the determination of a point or of a fact in issue before the jury.

"Mr. Carr: This jury has not so far examined the scene of the accident.

"Mr. Ewing: We are very apt to have the jury examine the scene of the accident and will be glad to have them do so.

"The Court: I believe the witness may answer. He is familiar with the conditions at the time. He may answer. . . .

"The Witness: At that rate of speed I would say 'Yes.' "

This witness had testified that he was a civil engineer and in his work had driven an automobile about twelve thousand miles a year, and in a general way

had described the gravel pit road and the highway; had stated that the highway at its conjunction with the gravel pit road was twenty-nine feet wide, of which twenty-one feet were paved and four feet on each side, being the shoulders, were unpaved; had also stated the approximate width of the gravel pit road where it joined the highway. This witness or other witnesses had stated that the gravel pit road and the highway paralleled each other for about one thousand feet before they came together, and that persons on either could, for several hundred feet, see both roads before and as they came together. It had also been made to appear that the highway was practically north and south in its course, on a grade something like two feet higher than the gravel pit road.

The question, reduced to its simplest form, may be stated about as follows: Granting that the Blanton automobile was being driven thirty-five to forty miles an hour, was the driver acting in a careful, lawful, and prudent manner, and was the speed a prudent one, reasonably proper and safe with regard to the traffic, the surface and width of the highway, and the conditions then existing? In other words, it asks the witness, in effect, whether under the circumstances Blanton, the driver of the automobile, was exercising reasonable care and driving safely at the time of the accident. In 11 Ruling Case Law 564, section 3, the general rule with reference to opinion evidence is stated as follows:

"Opinion evidence in its proper sense is admissible only under some exception to the general law of evidence. By the system established for the trial of causes in the Anglo-Saxon law, witnesses are commonly permitted to testify only to concrete facts which they have perceived by the use of their senses. It is for the jury to determine the truth as to the evidential facts from the testimony of the witnesses, and to draw the conclusion deducible from such evidential

facts by the exercise of their own judgment and reasoning powers. As to conclusions upon matters within the scope of common knowledge and experience, the jury is a tribunal well fitted to perform this task. To permit a witness to state to the jury his opinions as to the conclusions to be drawn from the concrete facts which he has observed would be to invade the peculiar province of the jury; and therefore conclusions of that character are universally excluded.''

In *Pointer* v. *Klamath Falls Land Co.,* 59 Or. 438, 117 Pac. 605, 606, Ann. Cas. 1913C 1076, the court said:

'' . . . we think it reasonably well settled that, where either negligence, recklessness, or carelessness constitute the ultimate fact for the jury to decide, it is not competent for an expert witness to express an opinion upon that ultimate fact.''

The phrase from the Pointer case is annotated in Ann. Cas. 1913C 1077, and it is there stated:

''The general rule is, as stated in the reported case, that where the ultimate fact for the jury is whether the conduct of a certain person was careless, reckless or negligent it is not competent for a witness to express an opinion, conclusion or judgment thereon.''

The cases cited as sustaining the above statement of the law are almost without limit. One of the best statements of the law on the question is contained in *Ferguson* v. *Hubbell,* 97 N. Y. 507, 49 Am. Rep. 544, from which we quote as follows:

''The general rule of law is that witnesses must state facts within their knowledge, and not give their opinions or their inferences. . . .

''It is not sufficient to warrant the introduction of expert evidence that the witness may know more of the subject of inquiry, and may better comprehend and appreciate it than the jury; but to warrant its introduction, the subject of the inquiry must be one relating to some trade, profession, science or

art in which persons instructed therein, by study or experience, may be supposed to have more skill and knowledge than jurors of average intelligence may be presumed generally to have. The jurors may have less skill and experience than the witnesses and yet have enough to draw their own conclusions and do justice between the parties. Where the facts can be placed before a jury, and they are of such a nature that jurors generally are just as competent to form opinions in reference to them and draw inferences from them as witnesses, then there is no occasion to resort to expert or opinion evidence. To require the exclusion of such evidence, it is not needed that the jurors should be able to see the facts as they appear to eye-witnesses or to be as capable to draw conclusions from them as some witnesses might be, but it is sufficient that the facts can be presented in such a manner that jurors of ordinary intelligence and experience in the affairs of life can appreciate them, can base intelligent judgments upon them and comprehend them sufficiently for the ordinary administration of justice.''

We think it may be safely stated that where the ultimate fact for the jury is whether the conduct of a person is negligent or careless or prudent or careful, it is not competent for a witness to express an opinion, conclusion, or judgment thereon. Note to Ann. Cas. 1913C 1077, *supra.*

This is not a case where the facts cannot be reproduced or made apparent to the jury, nor are the facts so numerous or conflicting as not to be easily related so that the jury could understand the situation. The court in *Demarais* v. *Johnson,* 90 Mont. 366, 3 Pac. (2d) 283, 285, 79 A. L. R. 553, quoted with approval from *Nutt* v. *Southern Pacific Railway Co.,* 25 Or. 291, 35 Pac. 653, as follows:

''The necessity for opinion evidence only exists where the facts in controversy are incapable of being detailed and described so as to give the jury an intelligible understanding concerning them; but when

the facts are such as can be detailed or described, and the jury are able to understand and draw a correct conclusion from them without such opinion evidence, the necessity for it does not exist.''

Whether it was prudent to drive at thirty-five or forty miles an hour at that point of the highway, it did not require any special knowledge or skill to decide. The ultimate fact was whether the deceased was guilty of the negligence that caused his death, or whether it was the negligence of the driver of the motor-truck, and the answer of this witness determined that matter in favor of plaintiff's intestate. That was the very question that the jury had to decide.

Under all the authorities it was error to admit this evidence over objection. Plaintiff says that even though it was error to admit it, the defendant waived or condoned it by questioning the witness at length upon the same point. As we understand it, the defendant's questioning of the witness was upon his cross-examination. Defendant did not make the witness its own. Such being the case, the defendant lost no right by cross-examining the witness.

If we could convince ourselves that this error was without prejudice to the rights of the defendant, we would notwithstanding refuse to reverse the case. No doubt Canfield occupied a rather prominent place in the minds of the jurors, he being the representative of the state to see that the work of construction was carried on properly. We cannot say just how much or how little credence was given to his judgment or conclusion, and for that reason we feel that the case should be retried.

There are a great many other assignments of error, especially on the admission of evidence. We have looked into them, but will not, since it is not necessary, review them.

The judgment of the lower court is reversed, and the cause remanded for a new trial.

McALISTER, C. J., and LOCKWOOD, J., concur.