213 P.3d 309

James **TARRON** and Sherry Tarron, husband and wife, Plaintiffs/Appellees,

v.

**BOWEN MACHINE & FABRICATING, INC.** dba Bowen Industrial Contractors, Inc., a foreign corporation, Defendant/Appellant.

No. 1 CA–CV 08–0436.

Court of Appeals of Arizona, Division 1, Department A.

July 7, 2009.

Ely, Bettini, Ulman & Rosenblatt By Ronald Ozer And Burt Rosenblatt, Phoenix, Attorneys for Plaintiffs/Appellees.

The Cavanagh Law Firm, P.A. By Ralph E. Hunsaker And Christopher Robbins, Phoenix, Attorneys for Defendant/Appellant.

## OPINION

BARKER, Judge.

¶ 1 Bowen Machine & Fabricating, Inc., doing business as Bowen Industrial Contractors, Inc., ("Bowen") appeals from the trial court's grant of partial summary judgment to James and Sherry Tarron on the issue of vicarious liability and the subsequent judgment after a jury trial finding Bowen 60%

liable for the Tarrons' damages. For the foregoing reasons, we reverse and remand.

### Facts and Procedural Background

¶ 2 In 2004, James Tarron was working for Phelps Dodge as a brick mason, diagnostic mechanic, equipment operator, pipe fitter, and welder at a copper smelter in Miami, Arizona. On February 20, 2004, he worked the night shift, which was scheduled from 5:00 p.m. to 5:00 a.m. During the prior night shift, two Bowen employees working as temporary employees at the smelter, Tony Cruz and Delbert Halkini, were assigned to remove the access ramps between converter # 2 and its "punching platform" to prepare the area to install a dome cover. Removing the ramps created a gap between the converter and the platform. Halkini put yellow caution tape across the opening so that no one would fall through and then he left on break. Phelps Dodge's standard operating procedures and OSHA standards required more than yellow caution tape to protect the opening. A proper barricade required a cable, wire rope, chain, or a permanent steel barrier. Phelps Dodge's subsequent safety analysis checks identified but failed to correct the hazard.

¶ 3 When Tarron arrived for his shift, he was assigned to do atmospheric monitoring for the high-speed duct on the seventh floor. After completing this task, he walked down multiple floors to find his coworkers who were assigned to install a dome cover for the # 2 converter. He walked over to the punching platform, leaned over to see if they were underneath the platform, placing one hand on a post and another hand on the plastic tape, thinking that a handrail was in place, and fell through. He fell approximately eighteen feet to the ground floor, fracturing his ankle and elbow. Tarron was hospitalized and received treatment for his injuries, including surgery on his ankle. He eventually returned to work but continued to experience pain.

¶ 4 In February 2006, the Tarrons filed suit against Bowen, alleging that Bowen was liable for the injury "by reason of the Doctrine of *Respondeat Superior*." After filing its answer, Bowen moved for summary judgment on the issue of *respondeat superior*, arguing that as a general employer, it could not be held liable for the actions of the employees it lent to Phelps Dodge. The Tarrons cross-moved for partial summary judgment on the issue of vicarious liability. After hearing oral argument on the motions, the trial court granted the Tarrons' motion, finding, based on the contractual agreement between Bowen and Phelps Dodge, that "Bowen had an apparently unexercised 'right to control'" the work of its employees.

¶ 5 The case proceeded to trial on December 5, 2007. After a six-day trial, the jury awarded the Tarrons $1.5 million, and found Bowen 60% at fault for James Tarron's injuries. Bowen subsequently moved for judgment as a matter of law or in the alternative for a new trial, which the trial court denied. Bowen timely appealed. We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") section 12–2101(B) and (F)(1) (2003).

### Discussion

#### 1. Bowen's Arguments

¶ 6 Bowen contends that it could not be held vicariously liable for Halkini's and Cruz's negligence as a matter of law, and is entitled to summary judgment in its favor, because Phelps Dodge had "exclusive control of, and the exclusive right to control, the lent employees'[1] performance of the 'specific injury-causing activity.'" Bowen asserts that the focus for liability purposes is on the employer who had control of the details of the task being performed at the time the injury occurred and that the relevant "activities occurred at the Phelps Dodge job site, while Halkini and Cruz were performing work for Phelps Dodge under the supervision of Phelps Dodge."

¶ 7 We take up first whether summary judgment against Bowen was appropriate. We review *de novo* a trial court's summary

---

1. We consider the phrases "lent employee," "loaned servant," and "borrowed servant" synonymous.

judgment ruling, viewing the evidence in the light most favorable to the party opposing the motion. *Warne Invs., Ltd. v. Higgins,* 219 Ariz. 186, 194, ¶ 33, 195 P.3d 645, 653 (App.2008). Summary judgment is appropriate when "there is no legally sufficient evidentiary basis for a reasonable jury to find for [a] party on [an] issue." Ariz. R. Civ. P. 50(a)(1), 56(c). We independently determine whether the trial court properly applied the law and whether there are any genuine issues of material fact. *Ruelas v. Staff Builders Pers. Servs., Inc.,* 199 Ariz. 344, 345, ¶ 2, 18 P.3d 138, 139 (App.2001).

¶ 8 The vicarious liability determination in this matter is governed by Arizona's "loaned servant" or "lent employee" doctrine. *Williams v. Wise,* 106 Ariz. 335, 337, 476 P.2d 145, 147 (1970). Under this doctrine, an employee of a "general" employer who is "loaned" to a "special" employer is treated as the employee of the special employer rather than the general employer for purposes of *respondeat superior. Id.* at 337–38, 476 P.2d at 147–48. Thus, generally only the special employer would be held vicariously liable for the employee's torts. *Id.*

¶ 9 However, the general employer may be held vicariously liable for a lent employee's tortious conduct if it had "control of or the right to control the performance of the lent employee's work." *McDaniel v. Troy Design Servs. Co.,* 186 Ariz. 552, 553, 925 P.2d 693, 694 (App.1996). The "right to control, rather than the actual exercise of control" is the key factor in determining whether the general employer may be held vicariously liable. *Williams,* 106 Ariz. at 338, 476 P.2d at 148. The focus is on whether the general employer had "control of the details of the particular work being done at the time of the injury-causing incident" and "which employer had the right to control the specific injury-causing activity." *Ruelas,* 199 Ariz. at 346, 347, ¶¶ 5, 11, 18 P.3d at 140, 141.

¶ 10 When facts are disputed, the lent employee relationship is a question of fact for the jury rather than an issue of law for the court. *Williams,* 106 Ariz. at 338, 476 P.2d at 148; *see also Lee Moor Contracting Co. v. Blanton,* 49 Ariz. 130, 135, 65 P.2d 35, 37 (1937) ("Whether a lent or hired servant continues [as] the servant of his general employer, or becomes the servant of the borrower or hirer, is always a question of fact."); *Ruelas,* 199 Ariz. at 346, ¶ 7, 18 P.3d at 140 ("It is a question of fact whether an employee continues as the general employer's servant or becomes the special employer's servant for a particular act."). The court may decide the issue of "who had the control or right of control at the time of the accident" only if the evidence is "clear and uncontradicted." *Williams,* 106 Ariz. at 339, 476 P.2d at 149.

¶ 11 Both parties refer us to *Ruelas* and *McDaniel v. Troy Design Services Co.,* 186 Ariz. 552, 925 P.2d 693 (App.1996). Therefore, we examine these cases in turn.

¶ 12 In *McDaniel,* we addressed whether a general employer, Troy Design, could be held liable for an accident that occurred while the Troy Design employee was in service to General Motors Corporation, ("GM"). 186 Ariz. at 553–54, 925 P.2d at 694–95. We noted that although Troy Design could hire and fire its employees, require its employees to comply with GM work rules, and sign time records, GM had "the exclusive right to control [the lent employee's] work activities at the GM proving ground" because GM supervised all of the employees' daily work activities, including "where, when, and how to work." *Id.* at 555, 925 P.2d at 696. We concluded therefore that Troy Design could not be held vicariously liable. *Id.* at 556–57, 925 P.2d at 697–98.

¶ 13 In *Ruelas,* we addressed whether Staff Builders, an agency that supplied nurses for Posada del Sol Health Care Center, could be held vicariously liable for an injury that occurred while its nurses were administering an enema to a patient. 199 Ariz. at 345, ¶ 1, 18 P.3d at 139. We held that summary judgment in favor of Staff Builders was proper. *Id.* at 348, ¶ 14, 18 P.3d at 142. We noted that while Staff Builders "was responsible for ensuring the nurses were licensed and experienced, and for administering minimum competency tests, paying the nurses, providing workers' compensation and liability insurance, and orienting the nurses to Posada del Sol's expectations, fire and disaster

program, dress code, and general nursing procedures," no facts supported the assertion that "Staff Builders actually controlled or had the right to control the manner in which the nurses gave the enema or performed any aspect of their work at Posada del Sol." *Id.* at 347, ¶¶ 8, 9, 18 P.3d at 141. In contrast, the record showed that "Posada del Sol informed Staff Builders' nurses of their responsibilities and supervised Staff Builders' nurses to the same extent as its own nurses." *Id.* at ¶ 9, 18 P.3d at 141.

¶ 14 Several of our cases addressing this doctrine have looked to the Restatement (Second) of Agency § 227 as an additional authority. *E.g., Williams,* 106 Ariz. at 337–38, 476 P.2d at 147–48; *Larsen v. Ariz. Brewing Co.,* 84 Ariz. 191, 198–99, 325 P.2d 829, 834 (1958); *Ruelas,* 199 Ariz. at 346, 347, ¶¶ 5, 11, 18 P.3d at 140, 141. The Restatement (Third) of Agency § 7.03 has since superseded § 227, which failed to provide "a consistent answer to the question of allocation of liability between general and special employers." Restatement (Third) of Agency § 7.03 (2006). Section 7.03 and Arizona law both recognize the "right to control" test. *McDaniel,* 186 Ariz. at 554, 925 P.2d at 695 ("Arizona follows the 'control or right to control' test to determine if a general employer is vicariously liable for the negligent acts of a lent employee."); Restatement (Third) of Agency § 7.03. The comment to § 7.03 propounds further on this test:

> Liability should be allocated to the employer in the better position to take measures to prevent the injury suffered by the third party. An employer is in that position if the employer has the right to control an employee's conduct. When both a general and special employer have the right to control an employee's conduct, the practical history of direction may establish that one employer in fact ceded its right of control to the other, whether through its failure to exercise the right or otherwise.
>
> . . . .
>
> . . . Any presumption that a general employer has the right to control an employee may be rebutted by proving factual indicia that the right has been assumed by a special employer.

Restatement (Third) of Agency § 7.03 cmt. (d)(2).

¶ 15 In our review, we must view the evidence in the light most favorable to Bowen. The trial court found that "it [was] undisputed that [Phelps Dodge] exercised actual control over the work at issue." The evidence supported this conclusion.

¶ 16 Patrick Fernandez, the on-site superintendent for Bowen, testified in his deposition that he simply provided sixteen temporary workers to Phelps Dodge for the Converter Project and "from then on, th[o]se people bec[a]me under the direction of Phelps Dodge." He testified that he had no daily contact with Halkini or Cruz, nor did he inspect their work or communicate with them to determine whether the work was properly performed. He testified that Phelps Dodge coordinated the Bowen employees' schedules and tasks and provided directions "on how to do [the tasks] and the proper procedure to do [the tasks]."

¶ 17 Gene Welker, Phelps Dodge's maintenance senior supervisor for the converter and turnaround, confirmed in his deposition that Phelps Dodge employee David Mikeworth supervised Cruz and Halkini the night the hazard was created. Welker testified that Mikeworth assigned Cruz and Halkini to remove the platforms at converter # 2 and install a temporary barrier. He stated that Phelps Dodge made the materials for installing a temporary barrier available in the converter tool room or the warehouse and that Phelps Dodge provided Halkini with the caution tape that he used.

¶ 18 David Mikeworth testified that before beginning each shift, he led a safety meeting, which lasted approximately thirty minutes, and then required both Phelps Dodge employees and Bowen employees to complete a job safety analysis for their work areas. Mikeworth admitted that he was responsible to ensure that Halkini and Cruz were properly trained and that he was responsible for job safety the night the hazard was created.

¶ 19 Thus, the fact that Phelps Dodge had actual control over the work at issue is not in dispute. However, the trial court also found that Bowen had an "apparently unex-

ercised 'right to control'" the work at issue. Viewing the evidence in the light most favorable to Bowen, we hold that summary judgment was not appropriate. Bowen offered evidence to controvert that it had a right to control the work at Phelps Dodge such that summary judgment in favor of the Tarrons was not proper.

¶ 20 Specifically, Patrick Fernandez testified that the contract provision providing that "[Phelps Dodge] will have no direction or control as to the method of performance of the work" was not in effect or did not apply to the Converter Project. He stated that Bowen and Phelps Dodge "didn't follow this procedure with the converters." Rather, he acknowledged that after supplying the Bowen employees to Phelps Dodge, he "ha[d] no right to supervise those workers when they [were] working for Phelps Dodge." Specifically, he asserted that he could not "go in [the Phelps Dodge site] being a contractor [and] change their direction of work." He explained that because Halkini and Cruz were "working under Phelps Dodge direction," he would not have been "authorized to walk into that converter area at 1 o'clock in the morning and start giving Cruz and Halkini orders and directions and instructions."

¶ 21 Based on this testimony, we find that there was a genuine issue of material fact as to whether Bowen surrendered to Phelps Dodge the exclusive right to control Halkini's and Cruz's work activities related to installing a barrier. This precludes summary judgment against Bowen. However, for the reasons set forth in the following section, we decline to enter summary judgment in favor of Bowen. As described below, we disagree with Bowen that it is "undisputed" that Phelps Dodge had the exclusive right to control the performance of injury-causing activity because we conclude that § 6 of the Master Agreement could support a finding that Bowen had the exclusive right to control "the method of performance of the Work." Absent this contractual provision, summary judgment in Bowen's favor would be appropriate.

### 2. Tarrons' Arguments

¶ 22 The Tarrons make two arguments in favor of affirming the entry of summary judgment against Bowen. They first argue that the contract between Bowen and Phelps Dodge governs the determination of whether Bowen was vicariously liable. Second, they argue that "a servant can have two masters" and that in this case both Phelps Dodge and Bowen could be held vicariously liable for the torts of the lent employees.

#### a. Whether the Contract Is Determinative on the Issue of Liability

¶ 23 The Tarrons first argue that the contract between Phelps Dodge and Bowen governs whether Phelps Dodge or Bowen had the right to control its employees in the lent employee context. The Tarrons point to § 6 of the Master Agreement between Bowen and Phelps Dodge as proof that Bowen had the "exclusive right to control the manner in which Bowen employees performed their work duties at the Converter Project." The relevant portion of § 6 provides:

QUALIFICATION AND INDEPENDENCE OF CONTRACTOR

. . . [Phelps Dodge] will have no direction or control as to the method of performance of the Work. [Bowen] has represented itself as an expert with respect to the performance and completion of the Work, and [Phelps Dodge] is relying upon the expertise of [Bowen] in performing, completing and accomplishing the results intended by the Work, even though [Phelps Dodge] may inspect the Work or provide materials or services in connection with the Work including, without limitation, specifications, drawings, or plans.

The Master Agreement defines "Work" as "the work to be performed and/or materials to be supplied by Contractor as required by the Contract Documents." The specific contract governing the Converter Project ("the Supplement") incorporated the terms and conditions of the Master Agreement. The Tarrons thus assert that "[u]nder the contracts, Bowen employees had the expertise to work independently, without supervision, and Phelps Dodge could rely on the Bowen employees to do a safe, professional job without

Phelps Dodge controlling the method of performance of their work."

¶ 24 The Tarrons also cite § 8.13 of the Master Agreement, in which Bowen "agree[d] to assume the entire responsibility and liability for any violations of [the provisions of the Occupational Safety and Health Act of 1970 and/or the Federal Mine Safety and Health Act of 1997] ... assessed against [Phelps Dodge] by MSHA, OSHA or any other Governmental Authority," to support that Bowen "agreed to control, have a right to control, and take responsibility for the safety of Bowen's employees at the Converter project." The Tarrons additionally reference § 8.18 of the Master Agreement, in which Bowen promised to "take all precautions necessary for the prevention of accidents, fires, theft, vandalism, injury or damage at the Project Site."

¶ 25 The Tarrons do not cite any Arizona case law to support that a contractual provision is determinative on the issue of control. The Tarrons direct us only to *Ruelas* and *McDaniel* for the proposition that we must examine the contractual relationship in determining a general employer's right to control its employees. We consider these cases in turn to examine our treatment of a contractual provision in the lent employee context.

¶ 26 In *McDaniel*, the plaintiff argued that the general employer had concurrent control with the special employer of the employee's performance. 186 Ariz. at 555, 925 P.2d at 696. The plaintiff pointed to the contract between the general and special employer, which provided that the special employer "was responsible (1) to hire and fire employees, (2) to require employee compliance with [the special employer's] work rules, (3) to sign time records, and (4) to comply with equal employment opportunity laws." *Id.* We recognized the contract as giving the general employer "some degree of control over its employees" but noted that such was insufficient for establishing vicarious liability because the evidence was undisputed that the special employer "had the exclusive right to control [the employee's] work activities." *Id.* This evidence was not derived from the contract but rather from testimony that "all the supervision ... was done by [the special

employer's] employees" and testimony that the special employer was "in charge of all of [the employees'] working conditions at the proving grounds, including where, when, and how to work." *Id.*

¶ 27 Similarly, in *Ruelas*, we considered the contract between the two employers to be "evidence" of the general employer's "administrative control," but we also looked for "facts to support an assertion that [the general employer] actually controlled or had the right to control the manner in which the nurses gave the enema or performed any aspect of their work at [the special employer's site]." 199 Ariz. at 347, ¶¶ 8–9, 18 P.3d at 141. The contracts in *Ruelas* and *McDaniel* were substantially different than the contract here. Neither contract provided expressly, as does the contract here, the special employer "will have no direction or control as to the method of performance of the work." Nonetheless, as we discuss, *infra* ¶¶ 28–38, we do not conclude that the contractual provision is controlling. It is evidence that precludes entry of summary judgment in Bowen's favor but does not resolve the disputed issue of which party (or both) *as a matter of fact* had the right to control the specific injury-producing conduct at issue. *Williams*, 106 Ariz. at 338, 476 P.2d at 148.

¶ 28 The Tarrons also direct us to a Georgia Supreme Court decision, *Tim's Crane and Rigging Inc. v. Gibson*, 278 Ga. 796, 604 S.E.2d 763 (2004). In *Tim's Crane*, the court held that because the contract of hire between the special and general employer "explicitly set[ ] forth each requirement of the borrowed servant doctrine," it established that the general employee "was a borrowed servant as a matter of law." *Id.* at 765. The court found the contract to be controlling as to the parties' respective responsibilities. *Id.*

¶ 29 The Tarrons also cite the Texas Court of Appeals' decision in *Anthony Equipment Corp. v. Irwin Steel Erectors, Inc.*, 115 S.W.3d 191 (Tex.Ct.App.2003), for the proposition that we need not consider the facts and circumstances of the project when a general and special employer contractually assign right of control. In *Anthony*, the Texas Court of Appeals noted that "two employers can contractually agree to assign 'right of

control'" and that with such an agreement "the court can decide the borrowed servant issue without considering the facts and circumstances of the project." *Id.* at 200. The court did not find an express assignment of the right of control in that case because the work order memorializing the oral agreement did not include a clause relating to supervision and control. *Id.*

¶ 30 However, subsequent to this decision, the Texas Court of Appeals decided *Coco v. Port of Corpus Christi Authority*, 132 S.W.3d 689 (Tex.Ct.App.2004). In *Port*, a longshoreman, John Coco, working for Dix Stevedores, fell from a crane owned by the Port and operated by Joe Hinojosa. *Id.* at 690. When Coco sued the Port of Corpus Christi, it moved for summary judgment arguing that Hinojosa was a borrowed servant of Dix Stevedores and that the Port was not liable for his torts. *Id.* at 691.

¶ 31 The Port submitted as evidence its contract with Dix Stevedores, which provided that all equipment would "be operated under the direction and control of the User and that the User [would] be responsible for the operation thereof." *Id.* The trial court thus entered summary judgment in favor of the Port. *Id.* Coco appealed, arguing that despite the contract, several facts indicated that the Port had control over Hinojosa. *Id.* Coco cited the fact that the crane was owned and operated by the Port and that the Port's general superintendent oversaw the crane operators to ensure that the cranes were operated safely. *Id.*

¶ 32 The Texas Court of Appeals reversed the summary judgment in favor of the Port, stating that "[i]t is well-settled law in Texas that contractual designations of control are not necessarily dispositive." *Id.* at 692. The court articulated that "a contractual designation of control will not establish borrowed servant status as a matter of law where evidence shows that the parties acted to the contrary." *Id.* at 692–93. It thus concluded that "even upon proof of a valid enforceable contract that designates control, summary judgment is improper where the non-movant raises fact issues showing that the parties acted in a manner not contemplated by their contract." *Id.* at 693; *see also Exxon Corp.*

*v. Perez*, 842 S.W.2d 629, 630 (Tex.1992) (reiterating that "[a] contract between two employers providing that one shall have the right of control over certain employees is a factor to be considered, but it is not controlling" on the issue of "whether a general employee of one employer may, in a particular situation, become the borrowed servant of another employer," and further noting that "[w]here the right of control prescribed or retained over an employee is a controverted issue, it is a proper function for the fact-finder to consider what the contract contemplated or whether it was even enforced").

¶ 33 Beyond Texas, other jurisdictions addressing right to control in the loaned servant context have also concluded that contractual language assigning right to control is not dispositive and have looked to additional evidence of the right to control. *See, e.g., Civello v. Johnson*, 567 So.2d 643, 647–48 (La.Ct. App.1990) (finding a material fact issue existed as to whether an Urban employee was a loaned servant of Cox notwithstanding a provision in a contract between Cox and Urban providing that "the manner and means of conducting the work were under the control of Urban," noting that notwithstanding the contract provision, Cox "exercised control of almost every aspect of its relationship with Urban personnel"); *Burgan v. City of Pittsburgh*, 115 Pa.Cmwlth. 566, 542 A.2d 583, 587–88 (1988) (affirming the trial court's ruling that CBI's employees were not borrowed servants of Ram despite CBI's Service Agreement with Ram providing Ram "sole supervision and control" over CBI's employees because "the facts belie[d] the language of the Service Agreement as to Ram being in control of the blasting"); *Arrow Elecs. v. Adecco Employment Servs. Inc.*, 195 S.W.3d 646, 653 (Tenn.Ct.App.2005) (concluding that the contract between the two employers established the employee as a loaned servant but noting that "despite the plain language of the Agreement," it must consider other evidence to determine "whether the Agreement was being followed at the time of the incident giving rise to this litigation (i.e., whether [the employee] was actually under the direction and control of [the borrowing employer] at that time)").

¶ 34 In a related context, the Supreme Court of California similarly concluded that a contract is not dispositive on the issue of right to control. *Kowalski v. Shell Oil Co.,* 23 Cal.3d 168, 151 Cal.Rptr. 671, 588 P.2d 811 (1979).[2] In *Kowalski,* the C. Norman Peterson Company ("Peterson") and Shell entered into a contract for Peterson to perform maintenance work at Shell. *Id.* 151 Cal.Rptr. 671, 588 P.2d at 812. The contract provided: "The parties hereto hereby create a general and special employment relationship with respect to all labor furnished hereunder and Shell, as the special employer, hereby is given the right to fully control the details and means of doing the work hereby contracted for." *Id.* 151 Cal.Rptr. 671, 588 P.2d at 813. A case arose when a Peterson employee, while operating a saw provided by Shell, accidentally amputated his hand. *Id.* Kowalski sued Shell for his personal injuries. *Id.* Shell asserted that Kowalski was a special employee who could only seek compensation under the worker's compensation law. *Id.*

¶ 35 In analyzing the special employment relationship, the court focused on "whether the special employer ha[d] the right to control and direct the activities of the alleged employee or the manner and method in which the work [was] performed, whether exercised or not." *Id.* 151 Cal.Rptr. 671, 588 P.2d at 815 (internal quotation marks omitted). The court noted that the trial court assigned too much weight to the Shell–Peterson contract when it concluded based on the contract's language that Kowalski was Shell's special employee. *Id.* The court emphasized that "[a]lthough the terms of a contract may specify that a special employer retains the right to control the details of an individual's work or purports to establish an employment relationship, 'the terminology used in an agreement is not conclusive ... even in

the absence of fraud or mistake.'" *Id.* (quoting *Tieberg v. Unemployment Ins.App. Bd.,* 2 Cal.3d 943, 88 Cal.Rptr. 175, 471 P.2d 975, 981 (1970)). It thus concluded that it needed to look to a number of factors in determining the special employment relationship because "a contract is not conclusive evidence of the existence of the right to control." *Id.* 151 Cal.Rptr. 671, 588 P.2d at 816.

¶ 36 In Arizona, in the related context of analyzing the special employment relationship for purposes of immunity from tort liability under the Workers' Compensation Act, we have similarly concluded that the contract between two employers is not determinative as to the nature of the relationship of the parties. Rather, we have held that it is "the objective nature of the relationship, determined upon an analysis of the totality of the facts and circumstances of each case, which is determinative." *Araiza v. U.S. W. Bus. Res.,* 183 Ariz. 448, 453, 904 P.2d 1272, 1277 (App.1995). In *Araiza,* Araiza, an employee of Manpower Temporary Services, was sent to work at the U.S. West reclamation plant. *Id.* at 450, 904 P.2d at 1274. While working at the U.S. West reclamation plant, Araiza injured his left hand, wrist, and arm while trying to unjam a cable stripping machine. *Id.* He then filed a negligence action against U.S. West. *Id.*

¶ 37 U.S. West filed a motion for summary judgment, contending that it was immune from suit because it was an employer of Araiza and carried a workers' compensation policy to cover its employees. *Id.* at 451, 904 P.2d at 1275. Araiza argued that U.S. West "contracted away its legal status as the employer of Araiza and thus [was] not entitled to workers' compensation act immunity from his tort claims." *Id.* The contract expressly provided that "[a]ll persons furnished by [Manpower] to perform the Services hereunder shall be considered solely the employees

---

2. In Arizona, the inquiry for determining a special employment relationship involves more factors than the loaned servant determination; however, both require analyzing a special employer's "right to control" the details or performance of the work. *See Inmon v. Crane Rental Servs.,* 205 Ariz. 130, 133, 135, ¶¶ 10, 18, 67 P.3d 726, 729, 731 (App.2003). In *Kowalski,* the court discussed the relevance of the contract while addressing "the primary consideration" for

"whether a special employment relationship exists," which it identified as whether the special employer had "the right to control and direct the activities of the alleged employee or the manner and method in which the work is performed, whether exercised or not." 151 Cal.Rptr. 671, 588 P.2d at 815 (internal quotation marks omitted). The right to control determination in *Kowalski* is thus very similar to Arizona's inquiry in the loaned servant analysis.

or agents of [Manpower]." *Id.* We rejected Araiza's argument that this contractual provision precluded U.S. West from claiming that it was Araiza's employer for workers' compensation immunity purposes. *Id.* We emphasized that the contract "may be determinative of other matters in the business relationship" but that it was not determinative for purposes of whether the plaintiff was in a lent employee/special employer relationship. *Id.* at 453, 904 P.2d at 1277. Rather, that determination depended on "the objective nature of the relationship." *Id.*

■ ¶ 38 Following this reasoning, we hold that the contract alone is not determinative of the right to control issue but rather constitutes evidence to be considered in resolving that issue. *Ruelas* makes clear that the question of "whether an employee continues as the general employer's servant or becomes the special employer's servant for a particular act" is a "question of fact." 199 Ariz. at 346, ¶ 7, 18 P.3d at 140. We will not limit the facts to be considered to the contract between the two employers but hold that the jury should consider all relevant facts, especially facts that contradict the clear terms of a contract.[3] *See* Restatement (Third) of Agency § 7.03 cmt. (d)(2) ("Any presumption that a general employer has the

right to control an employee may be rebutted by proving factual indicia that the right has been assumed by a special employer."). For this reason, entry of summary judgment in the Tarrons' favor is not appropriate.

#### b. Whether Halkini and Cruz Had Two Masters

¶ 39 The Tarrons secondly argue that a servant can have two masters, each of them vicariously liable for the servant's actions. They contend that Bowen is vicariously liable for Halkini's and Cruz's negligence because it had a right to control Halkini's and Cruz's work performance. They cite several facts in support of this contention, including "an exclusive contractual right to control"; testimony that Halkini had discretion in performing his welding; Halkini's testimony that Cruz, another Bowen employee, was "calling the shots" at the time he put up the tape; evidence that Halkini and Cruz had discretion with how they closed the gap; Bowen's control over Halkini's safety training and practices; and Bowen's expertise in safety. They additionally assert that Bowen is vicariously liable because "when Mr. Halkini put up the yellow tape, he was fulfilling obligations to both Bowen and Phelps Dodge," which financially benefitted Bowen.[4] Ari-

---

3. We also note that the contract in this case is not a model of clarity regarding the right to control. Although § 6 of the Master Agreement provides that "[Phelps Dodge] will have no direction or control as to the method of performance of the Work," the Supplement required Bowen to obtain authorization to enter the Phelps Dodge facility.

4. The fact that the lent employee's actions financially benefit the general employer has little bearing on the analysis. In *McDaniel*, the appellant argued that the general employer should be held jointly liable so long as its employee was "furthering the business" of the general employer. 186 Ariz. at 556, 925 P.2d at 697. We quoted our earlier decision in *Lee Moor Contracting Co. v. Blanton*:

> As long as the employee is furthering the business of his general employer by the service rendered to another, there will be no inference of a new relation *unless command has been surrendered*, and no inference of its surrender from the mere fact of its division.
>
> Control or right to control determines liability.

*Id.* (quoting *Lee Moor*, 49 Ariz. 130, 136, 65 P.2d 35, 37–38 (1937)). The *Ruelas* court similarly

clarified that Arizona does not follow the "furthering-the-business" standard in assigning liability but rather focuses on which employer had control over the performance of the employee's duties at the special employer's facility. 199 Ariz. at 347–48, ¶¶ 12, 13, 18 P.3d at 141–42.

The Tarrons also cite to cases from other jurisdictions, including *Lara v. Lile*, 828 S.W.2d 536 (Tex.Ct.App.1992), for the proposition that "both employers should be liable" so long as "an employee is fulfilling obligations to both a general and special employer," and *Kastner v. Toombs*, 611 P.2d 62 (Alaska 1980), for support that losses should be allocated according to each employer's fault. They also rely on the Restatement (Second) of Agency § 227, which provides for "an inference that the actor remains in his general employment, so long as, by the service rendered another, he is performing the business entrusted to him by the general employer." As to § 227, the updated Restatement (Third) of Agency § 7.03 recognized that this inference in the former § 227 created an inconsistent answer "to the question of allocation of liability between general and special employers." Restatement Third of Agency § 7.03 cmt. (d)(2). The result is that "dual liability has been characterized as a

zona courts recognize that a servant can have two masters and that both can be liable for their employee's actions. *McDaniel,* 186 Ariz. at 556, 925 P.2d at 697. This occurs when the loaned servant "is subject to some control from both his general employer and the special employer in performing his specific job functions." *Inmon v. Crane Rental Servs.,* 205 Ariz. 130, 135, ¶ 20, 67 P.3d 726, 731 (App.2003). We have directly addressed the issue of joint control in *McDaniel* and *Ruelas.*

¶ 40 In *McDaniel,* we noted that both employers could be held vicariously liable if both had a "joint right to control the performance" of the employee's work at the special employer's site. 186 Ariz. at 556, 925 P.2d at 697. We reiterated that "control or right to control determines liability" and that there will be no finding of liability if "command has been surrendered." *Id.* (quoting *Lee Moor,* 49 Ariz. at 136, 65 P.2d at 37–38). We did not find joint control in *McDaniel* because the general employer had "surrendered" command of the employee's performance while on the special employer's proving grounds. *Id.*

¶ 41 The *Ruelas* court also addressed the issue of joint control, noting that both employers could be held vicariously liable for an employee's action if they both had "joint control over performance of the employee's specific activities." 199 Ariz. at 348, ¶ 13, 18 P.3d at 142. The *Ruelas* court did not find joint control because there was no evidence that the general employer had any control over providing care to the patient or administering the enema. *Id.* We interpreted *McDaniel* to stand for the proposition that although a general employer may exercise "some control" over the employee, the general employer will not be held vicariously liable for the employee's actions unless it had control over the employee's performance of his specific activities at the special employer's facility. *Id.*

source of a new area of uncertainty in the law and might force a change in business practices of borrowing and loaning employers, the purchase of additional insurance, and the negotiation of indemnity agreements." *Id.* Therefore, we de-

¶ 42 The question of whether the employers had joint control is a question of fact, and the focus is on the specific injury-causing activity. Restatement (Third) of Agency § 7.03 cmt. (d)(2) ("It is a question of fact whether a general or a special employer, or both, have the right to control an employee's conduct."); *Inmon,* 205 Ariz. at 135, ¶ 20, 67 P.3d at 731 ("When all of the aspects of performing the 'specific injury-causing activity' are under the control of the temporary employer, the general employer's retained control over the administrative aspects of employment only is not enough to impose vicarious liability on the general employer."). In analyzing the joint control question, we also recognize that "[w]hen both a general and special employer have the right to control an employee's conduct, the practical history of direction may establish that one employer in fact ceded its right of control to the other, whether through its failure to exercise the right or otherwise." Restatement (Third) of Agency § 7.03 cmt. (d)(2).

¶ 43 In considering the grant of summary judgment against Bowen, we must view the evidence in the light most favorable to Bowen and focus on the specific injury-causing activity, which in this case is the task of barricading an opening between a punching platform and converter after removing the ramps.

¶ 44 Bowen provided extensive evidence to prove it surrendered to Phelps Dodge all control over its employees' work performance while at the Phelps Dodge facility. Again, this included testimony from Patrick Fernandez, Bowen's on-site supervisor, that once he handed the employees over to Phelps Dodge, the employees came under Phelps Dodge control. He stated that he had no daily contact with Halkini and Cruz and that he played no role in assigning their duties, instructing them on how to perform their duties, or inspecting their work to ensure it was properly performed. Although Fernandez admitted that it was likely at some point that Bowen instructed Halkini (but not Cruz)

cline to adopt this inference. We also decline to adopt the analyses laid out in *Lara v. Lile and Kastner v. Toombs,* as Arizona law rejects the "furthering-the-business standard." *Ruelas,* 199 Ariz. at 347–48, ¶¶ 12, 13, 18 P.3d at 141–42.

on the procedure for properly flagging a barricade, he noted that he could not go into the Phelps Dodge facility to direct Halkini's or Cruz's work. Fernandez also testified that Phelps Dodge required the Bowen employees to follow Phelps Dodge's standard operating procedure and that Phelps Dodge required the Bowen employees to attend daily safety training meetings.

¶ 45 Bowen also provided the deposition of David Mikeworth, a Phelps Dodge supervisor, in which Mikeworth agreed that "Phelps Dodge had overall responsibility to ensure that all employees working in the smelter at any time ... have a safe work environment" and that he was "responsible for job safety" the evening that the hazard was created. Mikeworth testified that Halkini and Cruz "should have got a hold of [him]," their supervisor, to ask for assistance in providing a proper barricade.

¶ 46 Bowen also provided the deposition testimony of Gene Welker, who stated that Halkini obtained the caution tape used to barricade the opening from Phelps Dodge and that Phelps Dodge provided access to other materials to properly barricade the opening. Welker identified Patrick Fernandez's role as restricted to "handl[ing] the administrative functions for Bowen employees," and stated that a Phelps Dodge supervisor directed the Bowen employees on their job tasks.

¶ 47 Taken together and viewed in a light most favorable to Bowen, this evidence controverts that Bowen had joint control with Phelps Dodge over Halkini's and Cruz's actions in putting up a proper barricade while working at the Phelps Dodge facility. Thus, because a genuine issue of material fact exists as to whether a single employer or both had control or the right to control Halkini's and Cruz's work performance in barricading the gap, summary judgment in favor of the Tarrons was improper.

¶ 48 As to Bowen's claim for summary judgment, to affirm the denial of summary judgment in Bowen's favor, we need only refer to the right it reserved in the Master Agreement. As pointed out earlier, Bowen agreed that Phelps Dodge would have "no direction or control as to the method of performance of the work." Bowen may present facts to convince a jury that the facts show the right to "command [or control] had been surrendered." *McDaniel*, 186 Ariz. at 556, 925 P.2d at 697. The jury should also be instructed that any such surrender of the right to command or control must have been explicitly or impliedly accepted by Phelps Dodge either by contract or conduct. However, the contractual term standing alone is so specific as to the right to control the work, rather than maintain solely administrative control, that it precludes summary judgment in Bowen's favor.

### Conclusion

¶ 49 For the foregoing reasons, we reverse and remand for a trial consistent with this decision. Because we reverse the trial court's summary judgment ruling, we need not address Bowen's alternative argument that the trial court erred in denying its motion for a new trial.

CONCURRING: PHILIP HALL, Presiding Judge and JON W. THOMPSON, Judge.

